**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| PHOENIX RISING MANAGEMENT, LLC, | ) | Case No. [   ] |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILADELPHIA INDEMNTIY INUSRANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |

**NOTICE OF REMOVAL**

**EXHIBIT A (File 1 of 2)**

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

PHOENIX RISING MANAGEMENT, LLC          )
                                        )
                    *Plaintiff,*         )
                                        )
-vs-                                    )
                                        )      No. **2021CH03335**
PHILADELPHIA INDEMNITY INSURANCE        )
COMPANY,                                )
                                        )
                    *Defendant.*         )

## COMPLAINT FOR
## DECLARATORY JUDGMENT AND OTHER RELIEF

Now comes the Plaintiff, PHOENIX RISING MANAGEMENT, LLC, by and through its

attorney Peter G. Syregelas of LINDSAY, PICKETT & POSTEL LLC, and for its Complaint for

Declaratory Judgment and Other Relief against PHILADELPHIA INDEMNITY INSURANCE

COMPANY states as follows:

### INTRODUCTION

1.      By this action, the plaintiff insured seeks a declaratory judgment that, with regard

to a lawsuit filed by the University Village Homeowner's Association ("UVHA") under Cause No.

21 L 000639 (Cook County, IL), Philadelphia Indemnity Insurance Company ("Philadelphia")

owed a duty to defend and indemnify plaintiff insured, that it wrongfully refused to seek a timely

declaratory judgment of its respective rights and responsibilities, that it is estopped from asserting

any defenses to coverage under its respective policies based on this breach and its delay in failing

to seek a timely declaratory judgment of its respective rights and responsibilities, that it breached

its duties to plaintiff insured in that it wrongly withheld the payment of defense fees and costs

incurred by the insured, that it wrongly attempted to have its insured accept only a portion of the

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

defense fees and costs incurred in the underlying litigation despite its recognition that it owed a duty to defend, that it has violated Section 155 of the Illinois Insurance Code (215 ILCS § 5/155), and that it is liable for prejudgment interest on all sums otherwise awarded pursuant to 815 ILCS § 205/2 and the Court's inherent authority.

## PARTIES

2.      Phoenix Rising Management, LLC ("Phoenix") is an Illinois limited liability company with its principal place of business located in Cook County, Illinois.

3.      At all times relevant, Philadelphia was an insurance company authorized to issue policies in the State of Illinois.

## THE CLAIM

4.      The UVHA through its counsel at the Kovitz Shifrin Nesbit law firm, sent a February 14, 2020, letter to Phoenix regarding the November 19, 2010, Management Agreement (the "Agreement") between the Association and Phoenix. The February 14, 2020, letter contained numerous allegations regarding the actions of Phoenix in managing the Association and certain fees that Association alleged were improperly charged, as more fully set out in **Pleading Exhibit A**, which represents a true and complete copy of the letter.

5.      On April 3, 2020, Phoenix responded to each of the points that were asserted by the UVHA in its February 14, 2020, letter. Phoenix asserted that it was entitled to the fees it had collected, that the Association had an outstanding balance, that Phoenix agreed to grant the UVHA certain credits, and that it was willing to negotiate a resolution.

6.      On September 28, 2020, the UVHA, through its counsel Grady Bell LLP, issued a letter captioned "RULE 408 SETTLEMENT COMMUNICATION" to Phoenix's counsel,

reiterating the assertions made in the February 14, 2020, letter, as more fully set out in **Pleading Exhibit B**, which represents a true and complete copy of the letter.

7.      On January 20, 2021, the UVHA filed a lawsuit under Cause No. 21 L 000639 (Cook County, IL) against Phoenix ("underlying lawsuit"). A true and correct copy of the underlying lawsuit is attached hereto as **Pleading Exhibit C**.

### NOTICE TO PHILADELPHIA

8.      Phoenix provided notice of the UVHA's claim to Philadelphia on October 12, 2020, when Philadelphia was provided with a "GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM."

9.      Philadelphia acknowledged the notice on October 14, 2020, and assigned claim number PHPV20101397997. A true and correct copy of the loss acknowledgement letter is attached hereto as **Pleading Exhibit D**.

10.     On November 3, 2020, Philadelphia denied coverage for the claim via email, specifically referencing one of two policies Philadelphia issued and which are more fully described below. A true and correct copy of the denial is attached hereto as **Pleading Exhibit E**.

11.     On July 2, 2021, Philadelphia, through its counsel, issued two letters to Phoenix setting forth its position as to the UHVA lawsuit under the two policies it issued to Phoenix.

12.     The letter related to the Philadelphia Cover-Pro policy, No. PHSD1441019, purported to decline coverage and requested a tender withdrawal. A true and correct copy of the July 2, 2021, letter related to the Cover-Pro policy is attached hereto as **Pleading Exhibit F**.

13.     The other letter, which is related to the Philadelphia Private Company Protection Plus policy, No. PHSD1539541, asserts that Philadelphia is entitled to decline coverage for various reasons, but then offers to contribute one-fourth (25%) of defense costs under the policy's

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Common Policy Conditions related to "Allocation," and further reserves the right to allocate indemnity costs. A true and correct copy of the July 2, 2021, letter related to the Private Company Protection Plus policy is attached hereto as **Pleading Exhibit G**.

14.     Both letters falsely asserted that Philadelphia had previously offered to advance defense costs for the underlying lawsuit from the date of tender.

### THE PHILADELPHIA POLICIES

15.     As noted, Philadelphia issued to Phoenix two insurance policies under which Phoenix tendered its defense for the underlying lawsuit.

16.     Philadelphia issued Cover-Pro policy, No. PHSD1441019, to Phoenix, for the period of May 1, 2019 to May 1, 2020, with liability limits of $1,000,000 for each claim and in the aggregate. What is believed to be a true and correct copy of Policy No. PHSD1441019 is attached hereto as **Pleading Exhibit H**. Plaintiff demands that Defendant attach a certified copy of its policy to its answer.

17.     Philadelphia also issued to Phoenix the Private Company Protection Plus policy, No. PHSD1539541, with general liability limits of $1,000,000 per occurrence for each of three coverage parts, each subject to a deductible, and $3,000,000 in the aggregate. What is believed to be a true and correct copy of Policy No. PHSD1539541 is attached hereto as **Pleading Exhibit I**. Plaintiff demands that Defendant attach a certified copy of its policy to its answer.

### COUNT I
### DUTY TO DEFEND AND INDEMNIFY

18.     Phoenix incorporates paragraphs 1 through 17 above, as if set forth fully herein.

19.     Phoenix contends that it is entitled to a defense and indemnity under the policies issued by Philadelphia for the underlying suit.

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

20.     The above contentions of Phoenix are, on information and belief, denied by Philadelphia which, in turn, contends that it has no duty or obligation to defend or indemnify. Phoenix, in turn, denies the contrary contentions of Philadelphia and each of them.

21.     By reason of the foregoing, an actual and justiciable controversy exists between the parties and each of them, which may be determined by a judgment or order of this Court. Pursuant to the terms and conditions of section 5/2-701 of the Illinois Code of Civil Procedure (735 ILCS § 5/2-701), this Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the policies of insurance referred to herein and to adjudicate the final rights of the parties and to give such other and further relief as may be necessary to enforce the same.

## COUNT II
### BREACH OF CONTRACT

22.     Phoenix incorporates paragraphs 1 through 21 above, as if set forth fully herein.

23.     Phoenix contends that Philadelphia's wrongful denial breached of the Philadelphia policies.

24.     The above contentions of Phoenix are, on information and belief, denied by Philadelphia which, in turn, contends that it has no duty or obligation to defend or indemnify. Phoenix, in turn, denies the contrary contentions of Philadelphia and each of them.

25.     By reason of the foregoing, an actual and justiciable controversy exists between the parties and each of them, which may be determined by a judgment or order of this Court. Pursuant to the terms and conditions of section 5/2-701 of the Illinois Code of Civil Procedure (735 ILCS § 5/2-701), this Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the policies of insurance referred to herein and to

FILED DATE: 7/8/2021 5:01 PM 2021CH03335

adjudicate the final rights of the parties and to give such other and further relief as may be necessary to enforce the same.

## COUNT III
### ESTOPPEL

26.     Phoenix incorporates paragraphs 1 through 17 as though set forth fully herein.

27.     Philadelphia breached its duty to defend Phoenix against the underlying litigation by failing to defend Phoenix under a reservation of rights or timely seek a declaratory judgment regarding its duty to defend.

28.     As a result of the breach, Philadelphia is estopped from asserting any policy defenses to coverage.

29.     The above contentions of Phoenix are, on information and belief, denied by Philadelphia. Phoenix, in turn, denies the contrary contentions of Philadelphia and each of them.

30.     By reason of the foregoing, an actual and justiciable controversy exists between the parties and each of them, which may be determined by a judgment or order of this Court. Pursuant to the terms and conditions of section 5/2-701 of the Illinois Code of Civil Procedure (735 ILCS § 5/2-701), this Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the policies of insurance referred to herein and to adjudicate the final rights of the parties and to give such other and further relief as may be necessary to enforce the same.

## COUNT IV
### SECTION 155

31.     Phoenix incorporates paragraphs 1 through 30 as though set forth fully herein.

32.     There was at all times relevant herein a certain statute known as 215 ILCS 5/155 which provides as follows:

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

5/155.   Attorney fees

§ 155.   Attorney fees.

(1)    In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed anyone of the following amounts:

(a)    60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b)    $60,000;

(c)    the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

33.    Phoenix contends that based on its conduct, Philadelphia was unreasonable and vexatious in its handling of the claim, its denial of the claim, its attempt to have its insured to agree to an "allocation" of defense costs which is unsupported in Illinois law, and was therefore in violation of Section 155 of the Illinois Insurance Code.

34.    Phoenix is entitled to compensatory, consequential and statutory damages, costs, attorneys' fees, and all other relief permitted by Section 155 of the Illinois Insurance Code from Philadelphia which has forced Phoenix to suffer losses and force it unnecessarily to bring this suit and devote its resources to recover policy coverage to which it is entitled.

35.    As a result of Philadelphia's vexatious and unreasonable failure to comply with its duties under its policy, Philadelphia is subject to penalties under Section 155 of the Illinois Insurance Code. 215 ILCS § 5/155.

FILED DATE: 7/8/2021 5:01 PM 2021CH03335

### PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiff, PHOENIX RISING MANAGEMENT, LLC, prays that this

Court enters judgment finding and declaring the rights of the parties as follows:

### AS TO COUNT I:

A. Find and declare that Defendant Philadelphia Indemnity Insurance Company had a duty or obligation to defend and indemnify in connection with the underlying lawsuit.

B. Find that by Philadelphia's breach of its duty to defend, Philadelphia has surrendered the right to control the defense.

C. That this Court grant such other and further relief as it deems fair and proper.

D. That Phoenix be awarded and have and recover their just and reasonable costs incurred herein and have execution issue therefor.

### AS TO COUNT II:

A. Find and declare that Defendant Philadelphia Indemnity Insurance Company is in breach of its contracts with Phoenix.

B. Find that by Philadelphia's breach of its duty to defend, Philadelphia has surrendered the right to control the defense.

C. That this Court such other and further relief as it deems fair and proper, including the entry of a money judgment.

D. That Phoenix be awarded and have and recover its just and reasonable costs incurred herein and have execution issue therefor.

### AS TO COUNT III:

A. Find and declare that Defendant Philadelphia Indemnity Insurance Company is estopped from denying coverage for the underlying lawsuit.

B. Find that by Philadelphia's breach of its duty to defend, Philadelphia has surrendered the right to control the defense.

C. That this Court such other and further relief as it deems fair and proper, including the entry of a money judgment.

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

D.      That Phoenix be awarded and have and recover its just and reasonable costs incurred herein and have execution issue therefor.

## AS TO COUNT V:

A.      Find and declare that Philadelphia Indemnity Insurance Company was exatious and unreasonable in violation of Section 155 of the Illinois Insurance Code.

B.      That judgment be entered in favor of Phoenix, for a statutory penalty of not less than $60,000, plus an award of reasonable attorney fees incurred in this action, which award will be based on a separate fee petition to be filed within 30 days of the entry of this judgment, plus costs and interest.

C.      That this Court grant Phoenix, such other and further relief as the Court deems fit and just under the circumstances.

Respectfully submitted:

LINDSAY, PICKETT & POSTEL, LLC

By: _____
        Peter G. Syregelas

Peter G. Syregelas
312.970.5661
psyregelas@lpplawfirm.com
LINDSAY, PICKETT & POSTEL, LLC
10 S. LaSalle Street, Suite 1301
Chicago, IL 60603
Firm No. 62461
*Attorneys for Plaintiff*

Hearing Date: 11/8/2021 9:45 AM - 9:45 AM
Courtroom Number: 2508
Location: District 1 Court
    Cook County, IL

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

# EXHIBIT A

FILED DATE: 7/8/2021 5:01 PM   2021CH03335



| | 175 North Archer Avenue \| **Mundelein**, IL  60060 | T 847.537.0500 \| F 847.537.0550 |
| --- | --- | --- |
| | 55 West Monroe Street, Suite 2445 \| **Chicago**, IL  60603 | T 312.372.3227 \| F 312.372.4646 |
| | 35 South Washington, Suite 300 \| **Naperville**, IL  60540 | T 630.717.6100 \| F 630.548.5568 |
| | 209 8th Street \| **Racine**, WI  53403 | T 262.634.6750 \| F 847.537.0550 |

ksnlaw.com

February 14, 2020

**VIA REGULAR U.S. MAIL AND ELECTRONIC MAIL**
**(mk@prmchicago.com)**

Reply to: **Mundelein**
T  847.777.7248
dsavitt@ksnlaw.com

Phoenix Rising Management
c/o Michael Kennelly
1550 W. Carroll Ave. #300
Chicago, IL 60607

**Re:    University Village Homeowners Association**

Dear Mr. Kennelly:

As you know, we serve as legal counsel to the University Village Homeowners Association. The Board of Directors ("Board") has requested that we contact you regarding the Management Agreement ("Agreement") between the Association and Phoenix Rising Management Group, Ltd. ("Phoenix"). Specifically, the Board has requested that we contact you in regard to certain issues that have arisen during the transition from Phoenix to the Association's new management company, Associa Chicagoland. I've listed the issues below as well as provided a brief description of each issue.

As an initial matter, it is our understanding that on October 2, 2018, Phoenix withdrew Two Thousand dollars ($2,000) from the Association's account in connection with the 2018 "Registered Agent Fee" charged by Phoenix to the Association. Thereafter, on January 29, 2019, Phoenix withdrew yet another Two Thousand dollars ($2,000) from the Association's account. That said, while Phoenix provided the Association with an invoice affirming that the initial charge was related to the Association's 2018 Registered Agent Fee, no such invoice was provided to support the January 29, 2019 withdrawal. In addition, we also understand that when the Association's auditor requested a fee schedule to confirm Phoenix's authority to withdraw said amounts from the Association's account, Phoenix produced the enclosed Fee Schedule dated July 26, 2019. Notably, said Fee Schedule indicates that the Registered Agent Fee to be charged annually is "$70 per unit…not to exceed $500.00." As such, the Board demands that Phoenix identify why the Association was charged a Two Thousand dollar ($2,000) Registered Agent Fee. If no basis exists to justify the charges, the Board demands that Phoenix reimburse the Association any amounts that were improperly charged during both 2018 and 2019.

On June 18, 2018, Phoenix withdrew Two Thousand dollars ($2,000) from the Association's account in connection with a charge for obtaining a "License/Permit." Further, on January 29, 2019, Phoenix withdrew an additional One Thousand Five Hundred dollars ($1,500) from the Association's account and cited the "annual report" as the basis for its withdrawal. Finally, on March 8, 2019, Phoenix withdrew yet another Three Thousand Five Hundred and Forty-One dollars ($3,541.67) which appears to also be in connection with an "annual report." Notably, per the above-cited Fee Schedule enclosed herewith, the "Annual Report Processing" fee is noted to be "$60 per unit … not to exceed $500.00." Accordingly, the Board demands that Phoenix identify its basis for the charges discussed above. If no basis exists to justify these charges, the Board demands that Phoenix reimburse the Association any amounts improperly charged on June 18, 2018, January 29, 2019 and March 8, 2019.

During 2018, the Association acquired several property additions, namely the South Garden and Rose Garden. During her audit, the Associations' auditor reviewed ledgers related to charges for two (2) months of reserves and ISF charges. While it appears that these charges were posted for the Liberty St. addresses within the

February 14, 2020
Page 2

FILED DATE: 7/8/2021 5:01 PM 2021CH03335

Association, they were not posted for the 15th St. addresses. Accordingly, we hereby request that Phoenix confirm whether the 15th St. addresses are due to be billed any charges for two (2) months of reserves and/or ISF charges.

Per the Association's insurance policy, a credit in the amount of Three Thousand Two Hundred and Eighteen Dollars and Twenty-One cents ($3,218.21) appears to have been deposited by Phoenix into the Association's account on February 8, 2019. To that end, Team Leader Giovanni Feliciano confirmed in the enclosed E-mail correspondence dated May 28, 2019 that the credit was applied to account for certain overpayments by the Association of its 2018 insurance premium. Curiously, however, the Association's October 2019 bank statement appears to indicate that on October 10, 2019, Phoenix reversed its decision to afford the Association with the credit and instead withdrew the above amount from the Association's account. As such, the Board hereby requests that Phoenix honor its decision to credit these funds to the Association and return the Three Thousand Two Hundred and Eighteen Dollars and Twenty-One cents ($3,218.21) to the Association.

In addition to the above, Mr. Feliciano also stated in his May 28, 2019 E-mail correspondence that "[a]n additional credit of $3,509.53 (for a total balance of $6,727.74) [was] pending." Notwithstanding Mr. Feliciano's representation that Phoenix would remit payment of the additional Three Thousand Five Hundred and Nine dollars and Fifty-Three cents ($3,509.53) to the Association, to date, Phoenix has failed and/or refused to do so. Therefore, the Board hereby requests that Phoenix honor its decision to credit these funds to the Association and remit payment of the Three Thousand Five Hundred and Nine dollars and Fifty-Three cents ($3,509.53) currently due and owing to the Association.

To correct certain overcharges incurred during 2017 pertaining to insurance coverage for the Association, it is our understanding that Phoenix issued a credit to the Association in the amount of Seven Thousand Seven Hundred and Thirty-Eight dollars ($7,738) payable through reduced management fees. Although Phoenix did, in fact, reduce the Association's management fees as promised, on October 10, 2019, Phoenix reversed the credit by withdrawing Seven Thousand Seven Hundred and Thirty-Eight dollars ($7,738) from the Association's account. In conjunction with the above, we hereby request that Phoenix honor its decision to credit these funds to the Association and return the Seven Thousand Seven Hundred and Thirty-Eight dollars ($7,738) to the Association.

Finally, as it pertains to insurance coverage procured for the Association, it is our understanding that the Association also incurred charges in the approximate amount of Thirty-Six Thousand dollars ($36,000) for additional insurance coverage over and above the coverages authorized by the parties' Agreement despite the fact that the Association had elected not to utilize Phoenix's Preferred Vendor Program. As such, we hereby request that Phoenix credit any and all charges related to insurance coverage secured on behalf of the Association over and above the policy placed with Phoenix Rising Insurance Services, LLC.

On October 3, 2019, Phoenix withdrew One Hundred and Fifty Thousand dollars ($150,000) from the Association's account and identified the purpose of the withdrawal as "Escrow." It has come to our attention that when the Association's auditor questioned the withdrawal, Phoenix simply referred the auditor to the termination clause contained in its Agreement with the Association. On behalf of the Board, we hereby request that Phoenix describe, in detail, the basis for its decision to withdraw One Hundred and Fifty Thousand dollars ($150,000) from the Association's account.

Moreover, it has come to our attention that during a recent review of the Association's financial records, the Board discovered approximately Sixty-Eight Thousand ($68,000) dollars of overage charges that were incurred by the Association in connection with landscaping services rendered by Semmer Landscape, LLC. We request that Phoenix explain why the Association incurred the overage charges and provide our office with any and all documents evidencing that said charges were imposed by Semmer Landscape, LLC.

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

February 14, 2020
Page 3

Further, we are also aware that the Board discovered a Seven Hundred and Fifty dollar ($750) charge that arose during November 2018 pertaining to "BOD guidance." Given that any discussions during said timeframe between yourself and the Board related to contract negotiation, we hereby request that you identify the basis for Phoenix's decision to charge said amount to the Association.

As you are aware, the Agreement by and between the Association and Phoenix terminated effective December 1, 2019. That being said, the ledger provided by Phoenix to the Association reveals several charges that arose after December 1, 2019 for services purportedly rendered on the Association's behalf. These services include, but are not limited to, "Vehicle Maintenance," "Janitorial" services, and maintenance allegedly performed at the property. As such, we hereby request that you advise as to why Phoenix continued to incur expenses on behalf of the Association notwithstanding the fact that the term of the Agreement had expired. In addition, we also hereby demand that Phoenix credit the Association for any and all expenses that arose subsequent to December 1, 2019.

Based on our discussions with the Board, we are also aware of certain "Reserve Expenses" in the amount of Ninety-Nine Thousand and Seventy-Five Dollars and Forty-Two cents ($99,075.42) that were recently disclosed by Phoenix. Specifically, the "Reserve Expenses" consist of the following charges: (1) Professional Services - $13,725.56, (2) Capital Repairs - $37,424.93, and (3) Exterior Painting Project - $47, 924.93. However, it is our understanding that these "Reserve Expenses" were not disclosed in any of the monthly financial reports that were generated by Phoenix during the term of the Agreement. On that basis, we request that Phoenix identify why it has only just disclosed these "Reserve Expenses" as due and payable from the Association.

Finally, we have been advised that upon reviewing the ledger for the 940-944 W. College Parkway Condominium Association, which is a sub-association within the Association, the Association's auditor discovered a credit in the amount of Four Thousand Five Hundred and Eight Two dollars and Fourteen cents ($4,582.14). That said, the information provided to date by Phoenix explaining how/why it decided to issue the credit to the 940-44 W. College Parkway Condominium Association does not adequately explain how/why this credit was issued. Accordingly, please describe, in detail, the basis for Phoenix's decision to afford the Four Thousand Five Hundred and Eight Two dollars and Fourteen cents ($4,582.14) to the 940-44 W. College Parkway Condominium Association.

Should you have any questions or concerns regarding this matter, please feel free to contact the undersigned at any time.

Sincerely,

David B. Savitt

cc: Board of Directors

    Courtenay Whitehead (cw@prmchicago.com)

iMange\CUNI015\00100\4177834.v1-2/13/20

Hearing Date: 11/8/2021 9:45 AM - 9:45 AM
Courtroom Number: 2508
Location: District 1 Court
    Cook County, IL

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

# EXHIBIT B



FILED DATE: 7/8/2021 5:01 PM   2021CH03335

53 West Jackson Blvd.    312.939.0964 OFFICE
Suite 1250    312.735.0886 MOBILE
Chicago, IL 60604    312.546.6820 FAX
*gradybell.com*    *jgrady@gradybell.com*

September 28, 2020

**RULE 408 SETTLEMENT COMMUNICATION**

<u>**VIA EMAIL**</u>:  bryan@wbs-law.com
Mitchell Bryan
Williams, Bax & Saltzman, P.C.
221 N. LaSalle Street, Suite 2700
Chicago, Illinois 60601

   Re:  Phoenix Rising Management, LLC

Dear Mr. Bryan:

   The University Village Homeowners' Association (the "Master Association") has retained this office to prevent Phoenix Rising Management, LLC ("Phoenix"), your client, from perpetrating an egregious fraud against the Master Association in flagrant breach of Phoenix's contractual and fiduciary duties required by the parties' Management Agreement dated November 29, 2010, as amended (the "Agreement").  During July 24, 2019 discussions between Phoenix and the Master Association about renewing the term of the Agreement, Phoenix's owner, Michael Kennelly, attempted to extort the Master Association by telling three members of the Master Association's Board that if the Master Association terminated the Agreement then Phoenix would find a way to impose significant additional charges on the Master Association.  As you know, the Master Association was not deterred and it terminated the Agreement effective December 1, 2019.  True to their word, Phoenix and Mr. Kennelly followed through with their extortionate threat.  They wrongfully retained $150,000 of the Master Association's funds, and then with an April 3, 2020 letter (the "Letter") to the Master Association attempted to claim $890,484.86 in fictitious additional fees and charges in obvious retaliation for the termination.  This letter responds to all of the points Phoenix raised in the Letter, and then, in a good-faith attempt to avoid litigation in the Circuit Court of Cook County and all the publicity that would potentially involve for both sides, concludes with a settlement demand which we believe to be extremely reasonable given Phoenix's exposure to significant compensatory and punitive damages arising directly from Phoenix's shocking breaches of the fiduciary duties that it owed to the Master Association as its agent.

   At the outset, it's worth noting that there is no question that Phoenix was the Master Association's fiduciary and at all times relevant to the Agreement held a position of trust and confidence with respect to the Master Association.   The Agreement, which Phoenix itself drafted, states expressly in Section 14 that "[t]he relationship of the parties to this

FILED DATE: 7/8/2021 5:01 PM  2021CH03335

Page 2
September 28, 2020

Agreement shall be that of Principal and Agent." As its agent, Phoenix owed the Master Association a set of duties that are among the highest duties known to the law, including the duty of loyalty. *Estergard, Eberhardt & Ackerman, Inc. v. Carragher*, 105 Ill. App. 3d 816, 819-820, 434 N.E.2d 1185, 1187, 1982. ("It is elementary that any agent owes a duty of loyalty to his principal and the relationship is one of trust and confidence.") See also Restatement (Second) of Agency, § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."). "The mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for himself, and if the agent does so, the transaction is presumed to be fraudulent." *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12. "The burden is on the agent to rebut the presumption by showing that he acted in good faith and that he did not betray the confidence placed in him." *Id.* at ¶13.

We these controlling principles in mind, will address the issues in the order they appear in Phoenix's Letter:

- "Point 1": Registered Agent Fees

Phoenix claims that it was entitled to charge the Master Association a $2,000 registered agent fee for both 2018 and 2019. Even if the two $2,000 fees for serving as a registered agent were allowed by the Agreement—and we have found no provision stating that they were—they are so patently excessive and unreasonable that they breached Phoenix's fiduciary duty to deal in good faith with the Master Association, its principal, in all transactions. Furthermore, such grossly excessive fees violated the Community Master Association Manager Licensing and Disciplinary Act, 225 ILCS 427/85(a)(20). The Master Association will agree to pay Phoenix no more than the two annual fees of $500 stated in the July 26, 2019 Schedule to the Agreement, but the Master Association is entitled to and demands an immediate refund of the additional $3,000 charged by Phoenix.

- "Point 2": License / Permit and Annual Report Fees:

Phoenix claims that it was entitled to withdraw $2,000 from the Master Association's account on June 18, 2018 in connection with obtaining a "license / permit" and $1,500 on January 29, 2019 in connection with an "annual report." These patently excessive fees breached Phoenix's fiduciary duties to the Master Association and violated 225 ILCS 427/85(a)(20) for the same reasons stated in response to "Point 1" above. The Master Association will accept nothing more than the annual fee of $500 stated in the July 26, 2019 Schedule to the Agreement. It is entitled to and demands an immediate refund of the additional $3,000 charged by Phoenix.

- "Point 3": Whether 15th Street Addresses are to be billed for 2 Months of Reserves and/or ISF Charges:

Page 3
September 28, 2020

Based on information received from the Master Association's auditors, the 15th Street sub-association payments in the amount of $12,000 were received by Phoenix. In,, breach of its contractual and fiduciary duties, Phoenix failed to disclose these payments during the audit and it failed to deposit these collections into the Master Association's bank accounts. The Master Association demands immediate payment of that $12,000.

- "Point 4":  Insurance Overpayment of $3,218.21:

Phoenix's Letter agrees to credit the Master Association for this amount, which will resolve the issue.

- "Point 5":  Insurance Overpayments of $3,509.53 and $7,738.00:

Phoenix's Letter agrees to credit the Master Association for these amounts, which will resolve the issue.

- "Point 6:  Unauthorized Insurance Costs of $36,000

Phoenix's decision to deliberately overcharge the Master Association by $36,000 insurance costs was an egregious breach of the Agreement and of Phoenix's fiduciary duties. Phoenix knew that it was charging the Master Association $36,000 for insurance coverage that the Master Association declined and did not receive. Specifically, Phoenix knew that the Master Association had procured its own insurance coverage effective June 27, 2019 after discovering that Phoenix had been charging the Master Association at least $20,000 per year above the market rate. Phoenix unquestionably and knowingly breached its fiduciary duties to the Master Association by imposing $36,000 in fees tied to non-existent insurance coverage.

Moreover, the $36,000 in charges breached the Agreement for the separate reason that it exceeded the cap for insurance fees set forth in Section 9. That section capped "Phoenix's "monthly fee" for "insurance" at "$3,541.67 ($42,500.04 annually). In breach Section 9, Phoenix caused the Master Association to pay Phoenix additional $36,000 over and above that cap. This also breached Section 3 of the Agreement, as modified by the November 30, 2015 Rider, which states that "Agent shall not make any unbudgeted expenditures or nonrecurring contractual obligation exceeding $2,500.00 with the exceptions of BoD approved contractual obligations, budgeted items or to address Emergency Conditions." On that basis alone, the Master Association is therefore entitled to and demand immediate repayment of the $36,000 of unauthorized insurance fees unilaterally taken by Phoenix.

Finally, because Phoenix received the insurance fees as part of "Agent's Compensation" (Section 9) the transaction is presumed fraudulent to the extent that

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Page 4
September 28, 2020

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Phoenix itself profited from it.  See, e.g., *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12.   The Master Association is therefore entitled to and demand immediate repayment of the $36,000 of unauthorized insurance fees unilaterally taken by Phoenix.

- "Point 7":  Phoenix's Withdrawal and Unauthorized Retention of $150,000 of the Master Association's Funds

    One way in which Phoenix and Mr. Kennelly have attempted to carry out their extortionate threat to retaliate for the Master Association's termination of the Agreement is that Phoenix has unlawfully retained $150,000 of the Master Association's funds in breach of the Agreement and Phoenix's fiduciary duties.  Although "Section 11 & 12" of the Agreement, as amended by November 30, 2015 Rider, allowed Phoenix to "withhold and deposit funds in its operating account, not to exceed the aggregate amount of all outstanding bills at the time of termination (as a general guideline ten percent (10%) of the annual operating budget), for ninety (90) days after the end of the month in which this Agreement is terminated," the 90th day has long since passed.  The Agreement terminated on December 1, 2019, and March 30, 2020 was the 90th day after the end of the month in which the Agreement terminated.  There was and is no legal basis for Phoenix to retain the $150,000 beyond the 90 days, let alone to the present day.  The Master Association is entitled to the immediate return of its $150,000 which Phoenix converted and has retained in breach of contract and its fiduciary duties to the Master Association.

- "Point 8":  Landscaping Services

    The Master Association categorically denies Phoenix's suggestion that the Board approved Phoenix's payment of approximately $68,000 in overage charges to Semmer Landscape, LLC and also disputes Phoenix's suggestion that the Board "worked in direct coordination" with the landscaping company.   Section 3.1 of the Agreement (as amended by the November 30, 2015 Rider) prohibited Phoenix from paying overages of more than $2,500 without Board approval.  The $68,000 in landscape overages exceeded that amount by more than $65,000 and unquestionably breached both the Agreement and Phoenix's fiduciary duties to the Master Association.  The Master Association is entitled to and demands immediate repayment of the excess amount in full.

- "Point 9":  $750 Charge for "Executive Team" Services

    Given the low dollars involved, the Master Association will agree to release its claim for this $750 if the parties can reach an agreement that resolves the other issues.

Page 5
September 28, 2020

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

- <u>"Point 10":  Services after Contract Termination</u>

The "Master Invoice" attached to Phoenix's April 3, 2020 letter includes charges for services that Phoenix allegedly performed after the December 1, 2020 termination of the Agreement.  Phoenix has absolutely no legal basis to charge for any of those services. Phoenix should have completed all transition-related tasks during the period between the Master Association's notice of termination and the termination of the contract.  Nothing in the Agreement (which is construed against Phoenix as its drafter) allows Phoenix to charge the Master Association for post-termination services, and nothing in the Agreement requires the Master Association to pay Phoenix for such post-termination services. Phoenix is without power to unilaterally impose charges that are outside of the Agreement.

But even if the Agreement somehow allowed Phoenix to charge for certain post-termination services, Phoenix had no right to charge for any of the post termination services that were "Routine" as the Section 2 of the Agreement defines that term.  Services were "Routine" under Section 2 if they involved no more than Phoenix's "duties and obligations under this Agreement."  All transition-related services were "Routine" by definition because they were explicitly duties and obligations of Phoenix under Section 11 & 12 of the Agreement, as amended.  Those sections expressly required Phoenix to provide the final accounting, among other transition-related services, as services under the Agreement.  And because they were "Routine," the price of those services was built into Phoenix' monthly management fee, which the Master Association paid in full for nearly 10 years before terminating the Agreement.   Phoenix cannot now charge separately for services that were "Routine" and, therefore, were within the monthly management fee.  In the same vein, the Master Association is entitled to a credit for all other "Routine" services for which Phoenix improperly charged separate fees.  The Master Association hereby demands an itemization and an immediate refund of all amounts Phoenix charged for "Routine" services during the term of the Agreement.

- <u>"Point 11":  Late-Disclosed Fees and Expenses</u>

For each of calendar years 2016, 2017 and 2018, Phoenix signed the certifications that we have attached to this letter stating that there were no "unpaid and unbilled liabilities to your management firm and any affiliated entities," to include "unbilled management fees, consulting fees, administrative/accounting fees and fees due to affiliated entities."  At the time that Phoenix made those certifications, Phoenix knew that they were used for financial reporting and, to our understanding, Phoenix never amended those certifications or otherwise disputed their accuracy.  Phoenix is now estopped from disputing the accuracy of those certifications years after the fact.  Furthermore, the handwritten invoices that Phoenix attached to the Letter are an obvious and ham-handed attempt to document and prop up the phony charges claimed in the Letter.  This embarrassingly poor attempt at fraud is yet another example of Phoenix and Mr. Kennelly

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Page 6
September 28, 2020

endeavoring to make good threat to retaliate for the Master Association's termination of the Agreement.  The Master Association therefore rejects all of Phoenix's attempts to charge for supposed 2016-2018 fees that Phoenix failed to disclose prior to the Agreement's termination, and whose nonexistence Phoenix repeatedly certified to financial auditors.

Fictitious 2019 Fees

The Master Association also rejects Phoenix's baseless attempt to charge the 2019 fees listed on the Master Invoice.  The $118,400 listed on Invoice HS-6241855 for 2019 "Engineer" and "Custodian" services ignores the fact that the Master Association already paid $126,840.24 in 2019 janitorial services according to the "Statement of Revenues & Expenses" prepared on December 30, 2019 by Joseph A. Rivkin, CPA (attached to the Letter).  Similarly, the $210,000 charge (Invoice HS-6241901) for violating the "Non-Solicitation" section of the Agreement (Section 5.8) is complete fiction.  The Master Association has never hired any of Phoenix's employees, including Giovanni Feliciano or Juan Torro, or otherwise violated Section 5.8.  But even if a violation had occurred, Section 5.8 is unenforceable under Illinois law because it is overbroad and covers even those Phoenix employees with whom the Master Association had no contact.

Disgorgement of Phoenix's' Undisclosed Profits from the "Vendor Program"

Section 27 of the Agreement, as amended by the November 30, 2015 Rider, describes a "Vendor Program" but discloses nothing about Phoenix profiting from that program.  Nothing in the Agreement permits Phoenix to receive kickbacks from vendors the Master Association hired through the Vendor Program, and the Master Association certainly never gave its consent to such kickbacks.  Furthermore, the Community Master Association Manager Licensing and Disciplinary Act, 225 ILCS 427/85(a)(12), prohibited Phoenix from "[d]irectly or indirectly giving to or receiving from any person, firm, corporation, partnership or Association any fee, commission, rebate, or other form of compensation for any professional services not actually or personally rendered."  However, our investigation has confirmed that the vendors who participated in the program paid undisclosed fees to Phoenix fees as a condition of their participation in the program—fees for which Phoenix performed no work and which therefore violated 225 ILCS 427/85(a)(12).  In breach of its fiduciary duties, Phoenix wrongfully retained all such fees paid by the Master Association's vendors rather than passing those fees on to the Master Association in order to lower the Master Association's vendor costs.  Of course, is settled law that "[unless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal."  Restatement (Second) of Agency, § 388.  Accordingly, the Master Association hereby demands that Phoenix account for and disgorge all profits it received in connection with vendors hired by the Master Association.

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Moreover, our investigation reveals that at least two of the vendor-program participants hired by the Master Association grossly inflated their pricing above the going market rate.   It appears that they did this with Phoenix's knowledge and encouragement in order to cover the costs of Phoenix's vendor-program fees.  As our investigation continues, we anticipate uncovering additional examples of this practice.  And if the Master Association is forced to move this matter into litigation then it will most certainly be issuing broad subpoenas to all of the Master Association's vendors in order to discover and then seek recovery of all vendor fees paid to Phoenix by the Master Association's vendors.

<u>Phoenix's Sub-Association Payments Scheme</u>

For a number of years, Phoenix executed a scheme that diverted sub-association funds that should have been paid to the Master Association.  In flagrant breach its fiduciary duties, Phoenix used those funds to pay both itself and its preferred vendors, depriving the Master Association of at least $237,000 in the process.  Phoenix hatched this scheme when, while managing the Master Association, Phoenix entered into additional management agreements with sub-associations in University Village.  Those agreements made Phoenix the manager of the sub-associations' finances, and it made Phoenix responsible for making all of the sub-associations' assessment payments due to the Master Association.  Phoenix's sub-association management agreements did not disclose Phoenix's conflicting fiduciary and contractual duties to the Master Association, and Phoenix never obtained any conflict waiver from the Master Association concerning the inherent conflict of interest that Phoenix created by serving as a fiduciary for both the Master Association and the sub-associations.

To carry out its scheme, Phoenix failed to properly collect and account for individual unit owners' obligations to pay their assessments owed to the Master Association.  Phoenix was able to get away with this because it made iself the middleman for all sub-association payments to the Master Association. Specifically, Phoenix used its position as manager of the sub-associations to create a payment system where instead of individual sub-association unit owners paying their Master Association assessments directly, Phoenix collected Master Association assessments from the entire sub association.  This arrangement made it impossible for the Master Association to identify individual unit owners who owed assessments to the Master Association. Put another way, Phoenix lumped together the sub-associations' payments to the Master Association, and therefore Phoenix's accounting made it impossible for anyone to determine whether individual unit owner was behind on their dues to the Master Association.

Phoenix used its control of sub-association funds to prioritize and pay its own management and insurance fees, as well as Phoenix's preferred vendors, before making any

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Page 8
September 28, 2020

payments to the Master Association.  Consequently, Phoenix ensured that the Master Association went partially or completely unpaid if a sub-association lacked funds to pay all of its obligations.  As of November 2019, these practices have left the Master Association with a combined sub-association receivable of $237,000.  During Board meetings, negotiations, emails, and other communications, it was made clear to the Board of Directors of the Master Association that Phoenix's Michael Kennelly, Giovanni Feliciano, Sonya Mishelle Berg, and Courtney were all aware and complicit in this scheme.  At no time during Phoenix's management of the Master Association were any attempts made to make the Master Association whole, nor did Phoenix stop the practice.

Phoenix's scheme violated a host of sections of the Community Association Manager Licensing and Disciplinary Act, 225 ILCS 427/1, et seq., including:

- 225 ILCS 427/85(a)(5)(Professional incompetence)
- 225 ILCS 427/85(a)(6)(Gross negligence)
- 225 ILCS 427/85(a)(7)(Aiding or assisting another person in violating any provision of this Act or its rules)
- 225 ILCS 427/85(a)(9)(Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public as defined by the rules of the Department, or violating the rules of professional conduct adopted by the Department).
- 225 ILCS 427/85(a)(9)(22)(Failing to account for or remit any moneys or documents coming into the licensee's possession that belong to another person or entity.
- 225 ILCS 427/85(a)(9)(28)(Failing to maintain and deposit funds belonging to a community association in accordance with subsection (b) of Section 55 of the Act [225 ILCS 427/55]).

In addition, Phoenix's misconduct violated at least the following sections of the Illinois Administrative Code:

- Section 1445.110(d): The scheme created an inherent and actual conflict of interest that was not properly disclosed to the Master Association.
- Section 1445.110(e): Phoenix violated its fiduciary duties owed to the Master Association as it systematically and regularly chose to pay itself, its vendors, and/or other accounts.  Such activity placed the interests of Phoenix above that of the fiduciary obligation it owed to the Master Association.

## Settlement Demand

For all of the reasons stated above, Phoenix's flagrant breaches of contract, breaches of fiduciary duty, violations of the Community Association Manager Licensing and

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Page 9
September 28, 2020

Disciplinary Act, and conversion of $150,000 of the Master Association's funds have damaged the Master Association in an amount well in excess of $500,000 in compensatory damages.  If the Master Association is forced to file a lawsuit, then in addition to its compensatory damages the Master Association will be seeking many times that amount in punitive damages, plus its attorney's fees pursuant to the attorney-fee clause in the Agreement.  The Master Association will also plead with great factual detail all of its statutory causes of action, including consumer fraud and deceptive business practices, which will carry additional damages and a separate entitlement to attorney's fees.  To avoid a lawsuit, however, the Master Association is willing to accept $400,000 from Phoenix subject to the execution of a mutually-satisfactory settlement agreement containing general releases among other customary terms.  This offer expires on October 9, 2020, after which the Master Association will be forced to commence litigation.

We look forward to Phoenix's prompt response.

Very truly yours,

/s/ John F. Grady

cc:      Board of Directors of The University Village Homeowners' Association

Hearing Date: 11/8/2021 9:45 AM - 9:45 AM
Courtroom Number: 2508
Location: District 1 Court
           Cook County, IL

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

# EXHIBIT  C

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| UNIVERSITY VILLAGE HOMEOWNER'S ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| PHOENIX RISING MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

**JAN 20 2021**

**DOROTHY BROWN**
**CLERK OF CIRCUIT COURT**

**21L000639**

## COMPLAINT

Plaintiff, University Village Homeowner's Association ("Plaintiff"), through its attorneys, Grady Bell LLP, complains against Defendant Phoenix Rising Management, LLC ("PRM LLC"), as follows:

1.    Plaintiff files this lawsuit to recover damages against Defendant, its property manager and fiduciary, arising from Defendant's campaign of premeditated self-dealing at Plaintiff's expense, despite owing Plaintiff a set of duties that are among the highest duties known to the law, including the duty of loyalty.

## PARTIES AND VENUE

2.    Plaintiff is a homeowner's association in Chicago, Illinois and serves as the master association for numerous sub-associations consisting of condominiums, townhomes and single-family residences.

3.    Defendant is a property management company with its principal office at 1550 W. Carrol Ave. in Chicago, Illinois.

4.    All or substantially all of the acts complained of in this lawsuit occurred in Chicago, Cook County, Illinois.

1

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

**BACKGROUND FACTS**

5.    On or about November 29, 2010, Plaintiff and Phoenix Rising Management Group, LTD ("PRM LTD") entered into a written "Management Agreement" under which PRM LTD agreed to provide Plaintiff with specified services in exchange for consideration.

6.    On or about August 25, 2011, Plaintiff and PRM LTD executed an Addendum to the Management Agreement.

7.    On or about November 30, 2015, Plaintiff and Phoenix Rising Management, LLC ("PRM LLC") executed a Rider to the Management Agreement.

8.    By its execution of the November 30, 2015 Rider to the Management Agreement, PRM LLC assumed all obligations of PRM LTD under the Management Agreement, as amended.

9.    On or about January 22, 2018, Plaintiff PRM LLC executed another Rider to the Management Agreement.

10.    Exhibit A to this complaint is a true and accurate copy of the Management Agreement as amended by the August 25, 2011 Addendum, the November 30, 2015 Rider and the January 22, 2018 Rider (collectively, the "Management Agreement").

11.    The Management Agreement states expressly in Section 14 that "[t]he relationship of the parties to this Agreement shall be that of Principal and Agent."

12.    As its agent, PRM LLC owed Plaintiff a set of duties that are among the highest duties known to the law, including the duty of loyalty.

13.    In spite of these duties, during July 24, 2019 discussions between Plaintiff and the PRM LLC about renewing the term of the Management Agreement, PRM LLC's manager, Michael Kennelly, threatened Plaintiff with harm when he told three members of Plaintiff's

2

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

DocuSign Envelope ID: CEFD43A8-A290-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Board that if Plaintiff refused to renew or terminated the Management Agreement then PRM LLC would retaliate by finding a way to impose significant additional charges on Plaintiff.

14.    In defiance of PRM LLC's extortionate threat, Plaintiff terminated the Management Agreement effective December 1, 2019 by sending a proper notice of termination to PRM LLC.

### PRM LLC's Retaliatory Retention of $150,000 of Plaintiff's Funds

15.    Under the terms of the Management Agreement, PRM LLC had access to Plaintiff's funds in various bank accounts.

16.    Following the July 24, 2019 discussions, PRM LLC withdrew $150,000 from Plaintiff's bank account in or about October 2019, ostensibly pursuant to "Section 11 & 12" of the Management Agreement, as amended by November 30, 2015 Rider, which stated that PRM LLC could "withhold and deposit funds in its operating account, not to exceed the aggregate amount of all outstanding bills at the time of termination (as a general guideline ten percent (10%) of the annual operating budget), for ninety (90) days after the end of the month in which this Agreement is terminated."

17.    March 30, 2020 was the 90th day after the end of the month in which the Management Agreement terminated.

18.    As of March 30, 2020, Plaintiff owed no outstanding amounts to PRM LLC.

19.    As of March 30, 2020, PRM LLC was not responsible for paying any bills on Plaintiff's behalf.

20.    There was and is no legal basis for PRM LLC to retain the $150,000 beyond the 90 days that ended on March 30, 2020, let alone to the present day.

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

21. In willful and wanton breach of its duties to Plaintiff, PRM LLC has retained Plaintiff's $150,000 in direct retaliation for Plaintiff's decision to exercise its contract right to terminate the Management Agreement.

22. Plaintiff has repeatedly demanded that PRM LLC immediately return the $150,000, but PRM LLC has refused.

23. Plaintiff is entitled to the immediate return of the $150,000 which Phoenix has retained in in willful and wanton breach of its duties to Plaintiff.

### PRM LLC's Imposition of Excessive "Registered Agent Fees"

24. For the year 2018, PRM LLC charged Plaintiff a "registered agent fee" of $2,000 and did so again for the year 2019.

25. A $2,000 annual fee for serving as Plaintiff's registered agent is so patently excessive and unreasonable that it breached PRM LLC's fiduciary duty to deal in good faith with Plaintiff, its principal, in all transactions.

26. Furthermore, such grossly excessive fees violated the Community Master Association Manager Licensing and Disciplinary Act, 225 ILCS 427/85(a)(20).

### PRM LLC's Imposition of Excessive License / Permit and Annual Report Fees

27. On June 18, 2018, PRM LLC withdrew $2,000 of Plaintiff's funds in connection with obtaining a "license / permit" and it withdrew $1,500 on January 29, 2019 in connection with an "annual report."

28. These patently excessive fees breached PRM LLC's fiduciary duties to Plaintiff and likewise violated 225 ILCS 427/85(a)(20).

4

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

## PRM LLC Retaliates by Imposing $36,000
## of Unauthorized Insurance Charges

29.     Pursuant to Section 9 of the Management Agreement, PRM LLC procured certain insurance coverages for Plaintiff and charged Plaintiff related insurance premiums by withdrawing amounts from Plaintiff's bank account.

30.     Because PRM LLC was Plaintiff's fiduciary, all such transactions were presumed fraudulent to the extent that PRM LLC itself profited from them.

31.     On or about June 24, 2019, Plaintiff informed PRM LLC that Plaintiff had procured its own insurance coverage effective June 27, 2019.

32.     Thereafter, in willful and wanton breach of its fiduciary duties and in retaliation for Plaintiff's refusal to renew the Management Agreement, PRM LLC charged Plaintiff $36,000 for insurance coverage that Plaintiff did not want and did not receive.

33.     Moreover, the $36,000 in charges breached the Management Agreement by, among other ways, exceeding the cap for insurance fees set forth in Section 9 which capped "Phoenix's "monthly fee" for "insurance" at "$3,541.67 ($42,500.04 annually). In breach of Section 9, PRM LLC charged and collected from Plaintiff an additional $36,000 over and above that cap.

34.     This misconduct also breached Section 3.1 of the Management Agreement, as modified by the November 30, 2015 Rider, which states that "Agent shall not make any unbudgeted expenditures or nonrecurring contractual obligation exceeding $2,500.00 with the exceptions of BoD approved contractual obligations, budgeted items or to address Emergency Conditions."

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

## PRM LLC Further Retaliates by Revoking Credits
## for Prior Overcharges for Insurance

35.    Sometime prior to October 2019, PRM LLC issued a credit to Plaintiff for $7,738 because PRM LLC admitted that it had overcharged Plaintiff for insurance premiums in 2017. PRM LLC issued the credit by reducing its management fees by that amount.

36.    However, on October 10, 2019 and in direct retaliation for Plaintiff's termination of the Management Agreement, PRM LLC reversed the credit by withdrawing $7,738 from Plaintiff's bank account without notice and without authorization.

37.    On or about February 8, 2019, PRM LLC deposited $3,218.21 into Plaintiff's bank account because PRM LLC admitted that it had overcharged Plaintiff for insurance premiums in 2018. In addition, on May 28, 2019, PRM LLC's employee Giovanni Feliciano advised Plaintiff via email that "[a]n additional credit of $3,509.53 (for a total balance of $6,727.74) [was] pending."

38.    However, on October 10, 2019 and in direct retaliation for Plaintiff's termination of the Management Agreement, PRM LLC reversed the credit by withdrawing $3,218.21 from Plaintiff's bank account without notice or authorization. Further, PRM LLC never paid Plaintiff the promised additional $3,509.53 credit.

### Overcharges for Landscaping Services

39.    On or about October 31, 2019, PRM LLC paid a total of $49,834.50 of Association funds to Brightview Landscapes, LLC, a landscape contractor of Plaintiff's, as "overage" charges without Plaintiff's authorization.

40.    PRM LLC's payment of these overages breached Section 3.1 of the Agreement (as amended by the November 30, 2015 Rider) which prohibited PRM LLC from paying overages of more than $2,500 without Board approval.

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

41.     The overages payment to Brightview Landscapes, LLC exceeded the $2,500 limit by more than $47,000 and unquestionably breached both the Management Agreement and PRM LLC's fiduciary duties to Plaintiff.

42.     Plaintiff has demanded that PRM LLC repay Plaintiff for the overpayment to Brightview Landscapes, LLC, but PRM LLC has refused.

## PRM LLC's University Village Sub-Association Payments Scheme

43.     For a number of years, PRM LLC executed a scheme that diverted assessment payments that were owed to Plaintiff by unit owners in University Village sub-associations.

44.     In flagrant breach its fiduciary duties, PRM LLC diverted those funds to pay both itself and its preferred vendors, depriving Plaintiff of at least $254,000 in the process.

45.     PRM LLC hatched this scheme when, while managing the Plaintiff, PRM LLC entered into additional management agreements with sub-associations in University Village.

46.     Those agreements made PRM LLC the manager of the sub-associations' finances, and it made PRM responsible for making all of the sub-associations' assessment payments due to Plaintiff.

47.     However, PRM LLC's sub-association management agreements did not disclose PRM LLC's conflicting fiduciary and contractual duties to Plaintiff, and PRM LLC never obtained any conflict waiver from Plaintiff concerning the inherent conflict of interest that PRM LLC created by serving as a fiduciary for both Plaintiff and also the sub-associations whose owners were contractually required to make payments to Plaintiff as the master association.

7

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

48.    To carry out its scheme, PRM LLC acted as the middleman and failed to properly collect and account for individual unit owners' obligations to pay their assessments owed to Plaintiff.

49.    Specifically, PRM LLC used its position as manager of the sub-associations to create a payment system where instead of individual sub-association unit owners paying Plaintiff its assessments directly, PRM LLC collected Plaintiff's assessments from the entire sub association. This arrangement made it impossible for Plaintiff to identify individual unit owners who owed assessments to Plaintiff.

50.    Put another way, PRM LLC lumped together the sub-associations' payments to Plaintiff, and therefore PRM LLC's accounting made it impossible for anyone to determine whether individual sub-association unit owners were behind on their dues to the Plaintiff.

51.    In willful and wanton breach of its fiduciary duties to Plaintiff, PRM LLC used its control of sub-association funds to prioritize and pay its own management and insurance fees, as well as PRM LLC's preferred vendors, before making any payments to Plaintiff.

52.    Consequently, PRM LLC allowed Plaintiff to go partially or completely unpaid if a sub-association lacked funds to pay all of its obligations.

53.    As of November 2019, these practices proximately caused Plaintiff to have a combined sub-association receivable of approximately $254,000.

54.    At no time during PRM LLC's management of Plaintiff were any attempts made to make Plaintiff whole, nor did Phoenix stop the practice.

55.    PRM LLC's scheme violated numerous sections of the Community Association Manager Licensing and Disciplinary Act, 225 ILCS 427/1, et seq., including:

a.   225 ILCS 427/85(a)(5)(Professional incompetence)

8

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM 2021CH03335

    b.  225 ILCS 427/85(a)(6)(Gross negligence)

    c.  225 ILCS 427/85(a)(7)(Aiding or assisting another person in violating any provision of this Act or its rules)

    d.  225 ILCS 427/85(a)(9)(Engaging in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud or harm the public as defined by the rules of the Department, or violating the rules of professional conduct adopted by the Department).

    e.  225 ILCS 427/85(a)(9)(22)(Failing to account for or remit any moneys or documents coming into the licensee's possession that belong to another person or entity.

    f.  225 ILCS 427/85(a)(9)(28)(Failing to maintain and deposit funds belonging to a community association in accordance with subsection (b) of Section 55 of the Act [225 ILCS 427/55]).

56.    In addition, Phoenix's misconduct violated at least the following sections of the Illinois Administrative Code:

    a.  Section 1445.110(d): The scheme created an inherent and actual conflict of interest that was not properly disclosed to the Plaintiff.

    b.  Section 1445.110(e): Phoenix violated its fiduciary duties owed to the Plaintiff as it systematically and regularly chose to pay itself, its vendors, and/or other accounts. Such activity placed the interests of Phoenix above that of the fiduciary obligation it owed to Plaintiff.

### Phoenix's' Undisclosed Profits from the "Vendor Program"

57.    Section 27 of the Agreement, as amended by the November 30, 2015 Rider, describes a "Vendor Program" but discloses nothing about PRM LLC or its affiliates profiting from that program.

58.    Nothing in the Agreement permitted PRM LLC or its affiliates to receive kickbacks from vendors Plaintiff hired through the Vendor Program, and Plaintiff certainly never gave its consent to such kickbacks.

59.    Furthermore, the Community Master Association Manager Licensing and Disciplinary Act, 225 ILCS 427/85(a)(12), prohibited PRM LLC from "[d]irectly or indirectly giving to or receiving from any person, firm, corporation, partnership or Association any fee,

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

commission, rebate, or other form of compensation for any professional services not actually or personally rendered."

60.    However, starting in or about 2015, and continuing through Plaintiff's termination of the Agreement in 2019, some or all of the vendors who Plaintiff hired through PRM LLC's Vendor Program paid undisclosed fees to PRM LLC, or its affiliates, as a condition of their participation in the program—fees for which PRM LLC and its affiliates performed no work and which therefore violated 225 ILCS 427/85(a)(12).

61.    In breach of PRM LLC's fiduciary duties, PRM LLC and/or its affiliates wrongfully retained all such fees paid by Plaintiff's vendors rather than passing those fees on to Plaintiff in order to lower Plaintiff's vendor costs.

62.    During the July 24, 2019 in-person meeting between Plaintiff's Board and PRM LLC's Michael Kennelly, the Board confronted Mr. Kennelly regarding PRM LLC's receipt of undisclosed kickbacks through the Vendor Program.  Rather than agreeing to end the kickback scheme and disgorge all ill-gotten gains, Mr. Kennelly proposed to share PRM LLC's kickbacks with Plaintiff on a going-forward basis.  Indeed, on July 26, 2019, Mr. Kennelly put the proposal in writing and sent the Board a proposed revision to the Agreement that had PRM LLC sharing 10% of the Vendor Program with Plaintiff.  Plaintiff rejected that proposal and to date PRM LLC has not disgorged any of the kickbacks it received from Plaintiff's vendors.

COUNT I - BREACH OF CONTRACT

63.    Plaintiff incorporates Paragraphs 1-62.

64.    PRM LLC's misconduct alleged in the foregoing paragraphs breached the terms of the parties' Management Agreement.

10

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

65.     PRM LLC's breaches have damaged Plaintiff in an amount to be determined at trial, but which is well in excess of $50,000.

66.     Plaintiff has demanded that PRM LLC's fully perform its obligations under the Management Agreement by paying Plaintiff all of the amounts specified in the foregoing paragraphs, but PRM LLC has refused.

67.     Plaintiff has fully performed all of its obligations under the Management Agreement.

WHEREFORE, Plaintiff demands judgment in its favor and against PRM LLC in amount to be determined at trial but which is well in excess of $50,000, plus costs, and for any other relief the Court deems appropriate.

**COUNT II – BREACH OF FIDUCIARY DUTY**

68.     Plaintiff incorporates Paragraphs 1-67.

69.     PRM LLC's misconduct alleged in the foregoing paragraphs breached the fiduciary duties that it owed to Plaintiff as Plaintiff's agent.

70.     PRM LLC's fiduciary breaches have proximately caused damages to Plaintiff in an amount to be determined at trial, but which is well in excess of $50,000.

71.     PRM LLC's fiduciary breaches were willful and wanton and merit an award of punitive damages.

WHEREFORE, Plaintiff demands judgment in its favor and against PRM LLC in amount to be determined at trial but which is well in excess of $50,000, including disgorgement of all of PRM LLC's profits arising from its fiduciary breaches, plus punitive damages, plus costs, and for any other relief the Court deems appropriate.

11

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

## JURY DEMAND

Plaintiff demands a trial by jury on all claims triable to a jury.

Respectfully submitted,

**UNIVERSITY VILLAGE HOMEOWNER'S ASSOCIATION**

By: __/s/ John F. Grady_____
One of Its attorneys

John F. Grady
Grady Bell LLP
53 West Jackson Blvd., Suite 1250
Chicago, Illinois 60604
Phone: (312) 939-0964
Fax: (312) 546-6820
jgrady@gradybell.com
FIRM ID: 56243

12

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

DocuSign Envelope ID: CEFD43A8-A29D-4EB4-B9FA-A1D42B74F641

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| UNIVERSITY VILLAGE HOMEOWNER'S ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| | ) Case No. |
| PHOENIX RISING MANAGEMENT, LLC, | ) ) |
| Defendant. | ) |

**91L000639**

**FILED**
JAN 20 2021
DOROTHY BROWN
CLERK OF CIRCUIT COURT

### COMPLAINT

The undersigned being first duly sworn upon oath, deposes and states that they are

an authorized representative for the plaintiff in this action and that the plaintiff seeks money

damages in excess of fifty thousand and 00/100 dollars ($50,000).

DocuSigned by:

*Cory Tanzer*

13ADCCE7F4E3418.

Authorized Representative of the University Village

Homeowner's Association

11 - 29
FILED
1/20/2021 3:50 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L000639
11905589

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639

---

### Management Agreement

---

ASSOCIATION:   The University Village Homeowners' Association
Located At: University Village
Chicago, Illinois 60607 & 60608

---

AGENT:        Phoenix Rising Management Group, LTD.
946 West Randolph, Suite 200
Chicago, Illinois 60607

---

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

This agreement (the "Agreement") is made and entered into this 29th day of November, 2010, by and between The University Village Homeowners' Association (the "Association"), which is established in accordance with the laws of the State of Illinois for the property known as University Village (the "Property") and Phoenix Rising Management Group, LTD. (the "Agent") located at 946 West Randolph, Suite 200, Chicago, IL 60607.

## AUTHORITY OF THE AGREEMENT

The Board of Directors of the Association (the "Board"), on behalf of the Association, hereby appoints Agent to provide Management Services, and Agent accepts appointment to provide Management Services.

The parties further agree as follows:

## Section 1 TERM OF AGREEMENT

The Board appoints Agent to transition the Management Services effective January 1st, 2011("Start Date") and to exclusively provide Management Services for the Property effective March 1st, 2011 ("Effective Date") for a period of twelve (12) months from Start Date ("Initial Term") and thereafter for a period of two (2) years unless this Agreement is terminated as provided in Sections 11 or 12. Agent's initial monthly fee will be effective February 14, 2011.

## Section 2 ROUTINE SERVICES OF AGENT

Agent shall perform its duties and obligations under this Agreement in accordance with the Association's governing documents and the requirements of the Common Interest Community Act and other applicable law or governmental regulation, including any amendments thereto. Agent shall provide Routine Management Services to the Property to the extent, for the period, and upon the terms of this Agreement. Agent shall perform all services in the name of and on behalf of the Association, and the Association hereby gives Agent the authority and powers required to perform these services. The Routine Services of the Agent shall be delineated in the Annual Operations Schedule ("AOS") as Attachment "B" to this Agreement.

### 2.1 COLLECTION OF ASSESSMENTS

Agent shall collect all monthly Homeowner assessments that are due the Association with respect to the Property. Agent shall coordinate on behalf of the Association for the mailing of Homeowner Statements on a monthly basis. In cases of Homeowner delinquencies, the Agent shall send a 30-Day Courtesy Letter of non-receipt of assessments, at 60 days, a 10-Day Notice of Demand and at 75 days will turn the file over to 3rd party legal for collection actions.

### 2.2 RECORDS OF INCOME AND EXPENDITURES

Agent shall maintain records of all income and expenses relating to the Property, and shall submit to the Association on a monthly basis no later than the last day of the current month a Balance Sheet, a Budget Comparison Report, an Expense Distribution Report, an Aged Receivables Report, a Material Variance Report, a copy of all Association Bank Statements for the preceding month and a copy of all invoices for the preceding month.

### 2.3 PREPARATION OF ANNUAL BUDGET

No later than October 1st of each calendar year, Agent shall submit to the Board a recommended Annual Budget for the next fiscal year, which begins on January first (1st), showing anticipated income and expenses for such year.

### 2.4 SUBMISSION OF ANNUAL REPORT & AUDITS

By April 1st of each fiscal year, Agent shall submit a Balance Sheet and Budget Comparison Report ("Annual Report") to all Homeowners of the Association. HOWEVER, submission of such Annual Report shall not be

Initials: _____

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



construed to require Agent to supply an audit. Any audit required by the Association shall be prepared at the Association's expense by an outside, third-party auditor(s). Agent will include in the AOS support of the annual audit requirements for the twelve (12) month period just expired.

**2.5 MAINTENANCE OF COMMON ELEMENTS**

On behalf of the Association, per the AOS and at the expense of the Association, Agent shall, maintain the common elements of the Property. The Agent shall perform all acts reasonably deemed necessary for the proper management of the Association.

**2.6 INTENTIONALLY OMITTED**

**2.7 AGENT'S PERSONNEL**

Agent agrees that one of its employees shall be designated as the Community Manager for the Association and another as the Assistant Community Manager. Agent will have a duty under this agreement to provide all Routine Services as delineated within this Agreement and all attachments. All such personnel shall be employees of the Agent, and all salaries, taxes, payroll charges, and other expenses payable to or on account of such employees shall be operating expenses of the Agent unless otherwise agreed to by Association in writing. HOWEVER, if there is a petition for unionization, or enacted any law, regulation, ruling or such mandate by any authority having jurisdiction of the subject matter of this Agreement that alters the hours of service, rates of pay, working condition or Agent's cost of performing the services provided herein, Agent may, upon written notice to Association, provide evidence of the foregoing and adjust the rates for personnel for the actual increased costs incurred by Agent related to the foregoing.

**2.8 UTILITIES, INSURANCE AND SERVICES CONTRACTS**

On behalf of the Association and per the AOS Agent will negotiate contracts for services as necessary for the Property. Agent will make its Master Insurance Program and Preferred Vendor Program available to the Association. Agent shall also purchase on behalf of the Association such equipment, tools, appliances, materials, and supplies as are necessary for the proper operation and maintenance of the Property, which no one purchase shall exceed $1,000.00 without prior Board approval. All such contracts and purchases shall be executed in the name of the Association and at its expense.

**2.9 INSURANCE RECORDS & CLAIMS**

Agent shall maintain appropriate records of all insurance coverage for the Property carried by the Association as specified in paragraph 10.2. Per Attachment "A", Agent shall cooperate with the Board in investigating, reporting and facilitating repairs of all accidents or claims for damage relating to the ownership, operation, and maintenance of the Property, including any damage or destruction to them.

**2.10 START-UP**

Agent shall use its best efforts to obtain from previous management all outstanding invoices and have all property vendors transfer their accounts to Agent. After receiving the above materials from previous management, Agent shall set up building accounts on Agent's system. Agent is only responsible for posting the opening Owner ledger balances provided by previous management and depositing any funds per Section 5 of this Agreement. In addition, Agent shall notify owners of the individual units of the change in managing Agent and instruct them where to send payments and how to contact Agent.

**Section 3 LIMITATION ON EXPENDITURES BY AGENT**

In discharging its responsibilities under section 2 of this Agreement, Agent shall not make any unbudgeted expenditures or incur any nonrecurring contractual obligation exceeding $1,000.00, without the prior consent of the Association through the Board. HOWEVER, no such consent

Initials:

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607
PHONE: 312.850.3251 FAX: 312.850.3258
WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

shall be required to repay any advances made by Agent under the terms of this Agreement. Notwithstanding these limitations, Agent may, on be half of the Association and without prior consent of the Board, expend any amount or incur a contractual obligation in any amount required to deal with emergency conditions which may involve a danger to life or property or which may threaten the safety of the Property or the individual owners and occupants or which may threaten the suspension of any necessary service to the Property; provided , however, Agent shall use its best efforts to notify the Board of such expenditures.  Upon request of the Board President or designee, Agent shall obtain up to three additional bids on any work to be performed which exceeds $1,000.00.  Contracts may be submitted to the Association's legal counsel for review prior to execution at the decision of the Board.  Agent has the authority to sign contracts on behalf of Association with written notification to the Board by Agent and/or written Board approval to proceed.

**Section 4  AGENT NOT RESPONSIBLE FOR MAINTENANCE OF INDIVIDUAL UNIT**
Agent shall have no authority or responsibility for maintenance or repairs to individual units in the Property. Such maintenance and repairs shall be the sole responsibility of the owners individually.

**Section 5  DISPOSITION OF FUNDS**
Agent shall, on behalf of the Association, deposit collections and pay expenses as stated below.

**5.1  DEPOSIT OF COLLECTIONS**
Agent shall deposit all monies collected on behalf of the Association in a bank or other financial institution of Agent's choice whose deposits are insured by the federal government. Agent agrees that it is an obligation under this agreement to meet with the Board once annually to review the banking relationship upon the written notice from the Board. If the Board requests monies be deposited in another financial institution which does bank then Agent's increased operating expense will be borne by the Association.  The funds of the Association shall at all times be maintained separate and apart from Agent's own funds and from the funds of any others.  Agent's designees and the Board Treasurer shall be the only parties authorized to draw upon such accounts. Agent shall not be held liable in the event of bankruptcy or failure of such depository.  Agent agrees to maintain current banking fee structure.

**5.2  PAYMENT OF EXPENSES**
From the funds of the Association, Agent shall pay all expenses of the Property in a timely manner to include all charges or obligations incurred by the Association or by Agent on behalf of the Association with respect to the maintenance or operation of the Property, or pursuant to the terms of this Agreement or pursuant to other authority granted by the Board on behalf of the Association.  Agent shall pay all expenses of operation and management of the Property from the Association's funds held in account by Agent as defined in Section 3. Any amounts owed to Agent by the Association pursuant to the terms of this Agreement shall also be paid from such account at any time without prior notice to the Association as defined in Section 3.

**5.3  AGENT NOT REQUIRED TO ADVANCE FUNDS**
Agent shall have no obligation to advance funds to the Association for any purpose whatsoever. Any funds advanced to the Association by Agent shall be repaid to Agent immediately from the Association's funds. Any sums due Agent under any provision of this Agreement, and not paid within ten (10) days after such sums have become due, shall bear interest at the rate of twelve percent (12%) per annum.

**5.4  PROPERTY TAXES**
Agent shall have no responsibility for the coordination, communication, facilitation and/or payment of

Initials

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



Homeowner property tax bills. Any services required by Agent related to the Homeowner's property taxes will be provided per Attachment "A". Agent shall coordinate, communicate and facilitate the payment of any property taxes related to the Association's common area property, which will be made a part of the AOS.

**5.5 AFFILIATED FIRMS & SUBSIDIARIES**
The Agent shall disclose in writing any ownership interests that exist between the Agent and any other firm or individual with which Agent proposes to contract with, or purchase goods or services from, on behalf of the Association. Further, Attachment "A" will include a list of all Agent subsidiary companies. Agent subsidiaries will assess an administrative fee to associated vendors. HOWEVER, the Association will realize the full amount of all reduced hourly rates.

**5.6 REFINANCING & CLOSINGS**
Agent shall provide a Standard Closing Package consisting of the Rules & Regulations, Declaration & By-Laws, Current Year Budget, 22.1 Disclosure Statement and Paid Assessment Letter. In addition, Agent shall provide a Standard Condominium Questionnaire upon request.

**5.7 BONDING OF EMPLOYEES**
All employees of Agent, who handle or are responsible for the safekeeping of any monies of the Association shall be covered by Agent's fidelity (Employee Dishonesty) insurance policy protecting the Association in full compliance with all applicable law. Such insurance shall be in an amount and with a company determined by Agent and may be a blanket or umbrella bond. The Association shall be provided with proof of such insurance upon request.

**5.8 NON-SOLICITATION OF AGENT'S EMPLOYEES**
Unless otherwise provided in this Agreement or by written addendum to this Agreement, the Association and its members, employees and/or agents, hereby covenants and agrees that it will not disturb, hire, entice away or in any other manner persuade any of Agent's employees to alter, or convince said employees to alter, modify, or terminate his/her relationship with Agent or in any way employ any of the aforementioned employees during the term of this Agreement or for a period of eighteen (18) calendar months after the expiration or termination of this Agreement. Breach of this provision shall result in damages paid by the Association to Agent in an amount equal to 1.5 times the employee's gross salary per occurrence. The Association shall pay all expenses incurred by Agent including, but not limited to, Agent's costs and time, all attorneys' fees, costs, and expenses incurred to collect such damages.

**Section 6 ATTENDANCE AT BOARD MEETINGS**
Agent, or a designated employee or other representative of Agent, shall attend up to twelve (12) meetings of the Board or Committee annually. Attendance at said meetings is for a maximum of four (4) hours and is considered a duty under this Agreement and is included in the monthly management fee. Meetings greater than four (4) hours will be provided per Attachment "A". Upon not less than seven days notice, Agent or its designated representative shall attend additional meetings of the Board or of the Association as requested per Attachment "A" for that individual's attendance at each additional meeting. Agent or its representative shall be custodian of the official records of the Board and the Association. HOWEVER, neither Agent nor its representative shall be required to record the minutes of such meetings.

**Section 7 ONE BOARD MEMBER TO DEAL WITH AGENT**
The Board shall designate one of its members and one alternate who shall be authorized to deal with Agent on any matter relating to the management of the Property. Agent shall not accept directions or instructions with regard to the management of the Property from anyone else. In the absence of any other designation by the Board, the President of the Board or his/her designee shall be deemed to have this authority.

Initials:

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



## PHOENIX RISING MANAGEMENT GROUP, LTD.
### REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

## Section 8 LIMITATION OF AGENT'S AUTHORITY AND RESPONSIBILITY

Agent's authority to act and responsibility for the Property shall be subject to the limitations set forth below.

### 8.1 STRUCTURAL CHANGES

Agent shall have no responsibility to make any structural changes in the Property or to make any other major alterations or additions in or to any building or equipment therein, except when Agent has been notified that emergency repairs may be required because of danger to life or property or which are immediately necessary for the preservation and safety of the Property or for the safety of the individual owners and occupants or which are required to avoid the suspension of any necessary service to the Property.

### 8.2 BUILDING COMPLIANCE

Agent shall not be responsible for the compliance of the Property or any of its equipment with the requirements of any building codes or with any statutes, ordinances, laws, rules, or regulations (including those relating to the existence and disposal of solid, liquid, and gaseous wastes, and toxic or hazardous substances) of any city, county, state, or federal governments or agencies, or any public authority or official thereof having jurisdiction over it, except for those obligations undertaken by Agent pursuant to Section 2.5 of this Agreement. The Association represents that to the best of its collective knowledge the Property complies with all such requirements, and the Association authorizes Agent to disclose the ownership of the Property to any such officials and agrees to indemnify, defend, and hold Agent, its representatives, servants, and employees, harmless of and from all loss, cost, expense, and liability whatsoever which may be imposed on them by reason of any present or future violation or alleged violation of such laws, ordinances, rules, or regulations.

### 8.3 AGENT ASSUMES NO LIABILITY

Agent assumes no liability whatsoever for any acts or omissions of the Board or the Association, or any previous boards or current or previous owners of the Property, or any previous management or other agent of either. Agent assumes no liability for any failure of or default by any individual unit owner in the payment of any assessment or other charges due the Association or in the performance of any obligations owed by any individual unit owner to the Association, pursuant to any lease or otherwise. Agent likewise assumes no liability for any failure of or default by concessionaires in any rental or other payments to the Association. Nor does Agent assume any liability for previously unknown violations of environmental or other regulations which may become known during the terms of this Agreement. Any such regulatory violations or hazards discovered by Agent shall be brought to the attention of the Association in writing, and the Association shall promptly cure them.

### 8.4 SAVE ASSOCIATION HARMLESS

The Agent shall indemnify, defend and save Association harmless from all suits or other claims arising out of our relating to any negligent or willful actions of Agent or its employees in connection with the property or the management thereof and from liability for damage to property and injuries to or death of an employee or other person arising out of the actions or neglect of Agent or its employees, if said action was outside the scope of their authority.

## Section 9 AGENT'S COMPENSATION FOR MANAGEMENT SERVICES

The Association shall pay Agent a monthly fee of $3,480.00. The fee shall be adjusted after December 31, 2011 with two and a half percent (2.5%) annual increases, which adjustment shall be incorporated into this Agreement by reference to the Annual Budget unless this Agreement is otherwise terminated. Attachment "A" may change annually, which changes, shall be communicated and incorporated into this Agreement by reference to the Annual Budget.

Initials: 

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251   FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

### Section 10 OBLIGATIONS OF THE ASSOCIATION

The Association shall insure the Property, Board, Agent and itself against liability and bear the expense of any and all litigation against the Property, Board, Agent and the Association as stated below.

### 10.1 SAVE AGENT HARMLESS FROM LIABILITY SUITS

The Association shall indemnify, defend and save Agent harmless from all suits or other claims including, but not limited to, those alleging any negligence of Agent, in connection with the Property or the management thereof and from liability for damage to property and injuries to or death of any employee or other person. The Association shall pay all expenses incurred Agent including, but not limited to, Agent's costs and time, all attorneys' fees, costs, and expenses incurred to represent Agent in regard to any claim, proceeding, or suit involving alleged negligence of Agent or its employees in connection with or arising out of the management of the Property. HOWEVER, the Association shall not be responsible to Agent for any such expenses in the event the Agent is finally adjudged to have acted in a negligent or willful manner in connection with or arising out of the management of the property, or if said action was outside the scope of their authority, or contrary to the terms of this agreement.

### 10.2 ESTABLISH AND MAINTAIN LIABILITY INSURANCE

The Association shall carry at its own expense all insurance as may be necessary or appropriate. Such insurance policies shall name both the Association and Agent as insureds, and their coverage shall be adequate to protect the interests of both parties. The Association shall provide Agent with the Endorsement Page evidencing such insurance or with duplicate copies of such policies upon request; or Agent may, but shall not be obligated to, place said insurance and charge the cost thereof to the account of the Association. Said policies shall provide that notice of default or cancellation shall be sent to Agent as well as to the Association and shall require a minimum of ten (10) days' written notice to Agent before any cancellation of or changes to said policies.

### 10.3 PAY ALL EXPENSES OF ANY LITIGATION

The Association shall pay all expenses incurred by the Agent including, but not limited to, Agent's costs and time, any liability, fines, penalties or the like, settlement amounts, and attorneys' fees for counsel employed to represent the Agent in any proceeding or suit involving breach of agreement and any alleged or actual violation by Agent of any law or regulation of any governmental body pertaining to environmental protection, fair housing, or fair employment, including, but not limited to, any law prohibiting or making illegal discrimination on the basis of race, sex, creed, color, religion, national origin, family status, or mental or physical handicap. HOWEVER, the Association shall not be responsible to Agent for any such expenses in the event the Agent is finally adjudged to have acted in a negligent or willful manner in connection with or arising out of the management of the property, or if said action was outside the scope of their authority, or contrary to the terms of this agreement.

### 10.4 SAVE AGENT HARMLESS FROM LABOR LAW VIOLATIONS

The Association shall indemnify, defend, and save Agent harmless from all claims, investigations, and suits, or from the Association's or the Board's actions or failures to act, with respect to any alleged or actual violation of state or federal labor laws. The Association's obligation with respect to such violation(s) shall include payment of all settlements, judgments, damages, liquidated damages, penalties, forfeitures, back pay awards, court costs, litigation expense and attorneys' fees. HOWEVER, the Association shall not be responsible to Agent for any such expenses in the event the Agent is finally adjudged to have acted in a negligent or willful manner in connection with or arising out of the management of the property, or if said action was outside the scope of their authority, or contrary to the terms of this agreement.

Initials

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 20211000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.

REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

**10.5  APPROVE ANNUAL BUDGET**

No later than October 1st of each calendar year, Agent shall submit to the Board a recommended Annual Budget for the next fiscal year, which begins on January first (1st), showing anticipated income and expenses for such year. The Board will adopt the Budget no later than December 1st. Upon approval, Agent shall be authorized to provide the Accounting Services to the Property in accordance with the Annual Budget and as outlined herein. Retroactive invoicing for budget adoption after the start of the fiscal year will be provided per Attachment "A".

**Section 11  TERMINATION BY AGENT**

The Agent may cancel this Agreement during the Initial Term with ninety (90) days written notice or at the end of any two-year renewal period provided that written notice is given to the other party on or before the ninetieth (90th) day prior to the expiration of such two-year renewal period.

**Section 12  TERMINATION BY THE ASSOCIATION**

The Association may cancel this Agreement during the Initial Term with ninety (90) days written notice or at the end of any two-year renewal period provided that written notice is given to the other party on or before the ninetieth (90th) day prior to the expiration of such two-year renewal period or per Section 12.1.

**Section 12.1  REMEDY AND MEDIATION**

Termination by the Association may be enacted after prior written notice is provided to Agent identifying specific tasks to be remedied or breaches of the terms of the Agreement. Agent shall have sixty (60) calendar days from receipt of notice to remedy said tasks and breaches, and responding in writing. At which time, both parties further agree to mediation between the parties facilitated by Kovitz, Shifrin, Nesbit, P. C. or Association's current legal counsel, prior to any termination of the Agreement.

**Section 12.2  RECOVERY OF EXPENSES**

If either party incurs any attorney's or other professional fees and other expense in the enforcement of the terms of this Agreement, the prevailing party shall be entitled to recovery of such attorney's and other professional fees and other expense from the losing party.

**Section 12.3  INDEMNITY/DEFENSE OBLIGATION**

Both Parties shall have the right to reasonably approve any reasonable defense any reasonable defense, disposition or settlement of any matter being defended by the other Party pursuant to any indemnity or defense obligation.

**Section 13  ASSOCIATION RESPONSIBLE FOR PAYMENTS**

Upon termination of or withdrawal from this Agreement by either party, the Association shall assume the obligations of any contract or outstanding bill executed by Agent under this Agreement for and on behalf of the Association and responsibility for payment of all unpaid bills. Agent may withhold funds not to exceed the aggregate amount of all outstanding bills at the time of termination, for ninety (90) days after the end of the month in which this Agreement is terminated, in order to pay bills previously incurred but not yet invoiced and to close accounts. Agent shall deliver to the Association, within ninety (90) days after the end of the month in which this Agreement is terminated, any balance of monies due the Association which were held by Agent with respect to the Property, a third party audit/compilation of the Association's records, as well as a final accounting reflecting the balance of income and expenses with respect to the Property as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Property.

Upon termination of the Agreement for any reason whatsoever, Agent shall within sixty (60) days turn over to Association all books, records, property and keys belonging to the Association, even in the absence of a final

Initials _____

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

accounting between the parties. It is expressly agreed that all books and records prepared by Agent for the Association during the term of this Agreement are the property of the Association. Agent may, at the cost of the association, retain copies of said books and records, but shall not use such materials in violation of any rights (proprietary or otherwise) of the Association or any of its members. The parties hereby agree that all of the foregoing items are unique and that deprivation of such items may cause damage which is not adequately compensable in money damages and, therefore, either Party shall be entitled to specific performance in the event of either Party coming in breach of this provision.

### Section 14  RELATIONSHIP OF AGENT TO THE ASSOCIATION

The relationship of the parties to this Agreement shall be that of Principal and Agent, and all duties to be performed by Agent under this Agreement shall be for and on behalf of, in the name of and for the account of the Association and any Addendum to this Agreement. In taking any action under this Agreement, Agent shall be acting only as Agent for the Association, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement except that of Principal and Agent, or as requiring Agent to bear any portion of losses arising out of or connected with the ownership or operation of the Property. Nor shall Agent at any time during the period of this Agreement be considered a direct employee of the Association. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement, except that Agent is authorized to act with such additional authority and power as may be necessary to carry out the spirit and intent of this Agreement.

### Section 15  INDEMNIFICATION SURVIVES TERMINATION

All representations and warranties of the parties contained herein shall survive the termination of this Agreement. All provisions of this Agreement that require the Association to have insured or to defend, reimburse, or indemnify Agent shall survive any termination; and if Agent is or becomes involved in any proceeding or litigation by reason of having been the Association's Agent, such provisions shall apply as if this Agreement were still in effect.

### Section 16  HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

### Section 17  FORCE MAJEURE

Any delays in the performance of any obligation of Agent under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, strikes, labor disputes, utility failures, government regulations, riots, adverse weather, and other similar causes not within the control of Agent, and any time periods required for performance shall be extended accordingly.

### Section 18  COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between the Association and Agent with respect to the management and operation of the Property and supersedes and replaces any and all previous management agreements entered into or/and negotiated between the Association and Agent relating to the Property covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by the Association and Agent. Except as otherwise provided herein, any and all amendments, additions, or deletions to this Agreement shall be null and void unless approved by the Association and Agent in writing. HOWEVER, Attachment "A" is subject to change once annually by reference to the Annual Budget. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, in entering into and executing this Agreement, has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein.

Initials

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

**Section 19 RIGHTS CUMULATIVE; NO WAIVER**

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercise from time to time and as often as may be deemed expedient by those parties.

**Section 20 APPLICABLE LAW AND PARTIAL INVALIDITY**

The execution, interpretation, and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of Illinois. If any part of this Agreement shall be declared invalid or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

**Section 21 NOTICES**

Any notice required or provided for in this Agreement shall be in writing, sent by United States mail and shall be addressed as indicated below or to such other address as Agent or Association may specify hereafter in writing.

**21.1 TO AGENT**
Phoenix Rising Management Group, LTD.
946 West Randolph - Suite 200
Chicago, Illinois 60607
Attn: Patrick Kennelly

**21.2 TO THE ASSOCIATION**
The University Village Homeowners' Association
Chicago, Illinois 60607
Attn: Mr. Paul Rieger - Board President

**21.3 DELIVERY OF NOTICES**
Notices or other communications between the parties to this Agreement may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository regularly maintained by the post office. Such notices may also be delivered by electronic methods such as email, by hand or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or seventy-two (72) hours after having been deposited in the United States mails as provided herein.

**Section 22 AGREEMENT BINDING ON SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Agent and the heirs, administrators, successors, and assigns of the Association. Notwithstanding the preceding sentence, Agent shall not assign its interest under this Agreement except in connection with the sale of all or substantially all of the assets of its business. In the event of such sale, Agent shall be released from all liability under this Agreement upon the express assumption of such liability by its assignee.

Initials

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251 FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

**Section 23  COUNTERPARTS**

This Agreement may be executed in one or more counterparts and shall be effective when one or more counterparts have been signed by each of the parties hereto.

**Section 24  AUTHORITY TO SIGN THIS AGREEMENT**

Each party whose signature is affixed hereto hereby represents and warrants that he or she is authorized and empowered to execute and deliver this Agreement on behalf of the parties hereto and bind the person or entity on whose behalf his or her signature is affixed.

**SIGNATURES**  Each person whose signature is affixed hereto in a representative capacity hereby represents and warrants that he or she is authorized and empowered to execute this agreement.

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures this 29th day November, 2010.

Agent:                                             Board:

_____              _____
Patrick Kennelly -President                 Mr. Paul Rieger - President
Firm: Phoenix Rising Management Group, LTD.    The University Village Homeowners' Association

Initials _____

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639



### PHOENIX RISING MANAGEMENT GROUP, LTD.
#### REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

### ATTACHMENT "A"

The following charges are for services performed by Agent or Agent's employees, and are valid through December 31st, 2011.  Charges may be modified from time to time and supersede all previous service rates and other contractual obligations.

Reproduction/Mailings & Miscellaneous:

* Copies (Black & White):       $0.15 per page
* Copies (Color):               $0.50 per page
* Small Envelopes:              $0.15/envelope
* Large Envelope:               $0.45/envelope
* Postage                       At Cost
* Statements                    At Cost
* Certified Mailings       $7.00/mailing
* FedEx/Courier                 $15.00/package
* Payroll Administration:       7.5% of Gross Pay
    * (Payroll Fee not applicable unless Association employs own personnel)

Services applied against individual Owner's Account:

* Collections/Court attendance   $120.00
* Evictions/Rentals              $105.00/hour
* Closing:                       $150.00
* Refinancing:                   $150.00

The Services that are applied against the individual Owner's Accounts are services normally provided by Agent's back office support staff for which the Agent realizes the associated income.  These fees will now become the Association's income as long as these services are performed by the assigned on-site staff assigned as part of this Agreement.  With advance notice and approval of both parties, if Agent is required to provide back office support for these services, then the associated fees will become income of the Agent.

Employees of Agent (After-Hours and Holidays):

* Community Manager            $105.00/hour
* Emergency Services           $110.00/hour

### NOTES:

Business Hours:  Normal business hours are 8:30 a.m. to 5:30 p.m. Monday through Friday excluding all Federal Holidays.  Any Emergency Services provided after normal business hours will be billed at a two-hour minimum.

Subsidiaries:  Welcome Home Doorman Services, Mop & Bucket Janitorial Services, Capital Repairs Services, Sunset Crisis Services, Odds & Ends Handyman Services, Cityscape Maintenance Services and Building Source Inc.

Initials:

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639



### ATTACHMENT "B"

Insert Annual Operations Schedule Here.

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

Date:      August 25th, 2011
To:        Board of Directors, University Village Homeowners' Association (Association)
From:      Phoenix Rising Management Group, LTD (Agent)
Subject:   Custodial & Maintenance Contract Addendum

This addendum is incorporated into the Condominium and Homeowners' Association Management Agreement (Agreement), dated November 29, 2010, attached hereto and made a part hereof, and is afforded all rights, protections, responsibilities, obligations, terms, conditions and will renew as set out in the Agreement or any subsequent Agreements entered into between the Association and Agent.

The Agent hereby represents and warrants to the Owner the following:

a.   That the Agent maintains its principal place of business at 946 West Randolph, Suite 200, Chicago, Illinois.

b.   That the Agent is financially solvent, able to pay its debts as they mature and possessed of sufficient working capital to complete the services required and perform its obligations hereunder.

c.   That the Agent is duly licensed and authorized to do business in the State of Illinois.

d.   That the Agent's execution of the Agreement and its performance thereof is within its duly authorized powers.

e.   That the Agent agrees that the representations contained within this paragraph shall survive the execution and delivery of the Agreement.

Agent shall perform its work in strict accordance with all applicable codes and regulations of the City of Chicago and State of Illinois.

Agent shall be responsible for establishing and enforcing all safety precautions and safety programs in connection with its work under the Agreement; shall give all notices and comply with all applicable laws, ordinances, rules and regulations related to the safety of persons and/or protection of property; and shall maintain all required signage and warnings against hazards to person or property.

The Association is responsible for all supplies. Agent will properly store all supplies so as to prolong their useful life and avoid waste.

The Agent is responsible for the expense of all equipment and expenses related to the maintenance of the equipment. All equipment is the property of the Agent. Service will be provided seven (7) days per week and prioritized as time permits per the following set of specifications:

Initials: _____

*946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607*
*PHONE: 312.850.3251  FAX: 312.850.3258*
*WWW.PHOENIXRISINGGROUP.COM*

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

Custodial:
- Exterior property: Walk Daily
  - Remove trash and debris
  - Remove or mitigate graffiti
  - Remove debris and waste from curbs
  - Remove debris on Emerald and Union Streets (from hotdog stands)
  - Restock dog waste bag containers
  - Discard junk mailings (items with no unit address)
  - Clean mail box exteriors
  - Wipe down hand rails
  - Wipe down emergency exit signs
  - Wipe fire extinguisher boxes

- Alleys:
  - Remove all trash and debris
  - Identify and remove graffiti

- Dog Park:
  - Remove trash and debris
  - Hose down
  - Restock dog waste bag containers

- Waste Containers:
  - Check/empty trash receptacles
  - Change liners
  - Wash containers

- Garbage Areas:
  - Pick up all extraneous trash and debris
  - Sweep
  - Hose down

- Water Fountain:
  - Pick up trash and debris
  - Hose and wipe down exterior

- Play Ground/Garden Areas:
  - Remove trash and debris
  - Replace sand in sand box
  - Wipe down equipment and benches

Initials: _MOR/_

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

Maintenance:
- Check / Replace all light bulbs, as needed
- Repair and replace all gates and hinges
- Repair and replace mailboxes
- Repair, replace and clean signage
- Painting Program (Develop and implement program subject to Board approval):
  - Iron Fencing
  - Gates
  - Entry ways and emergency service doors
  - Gutters
  - Roof top catwalks
  - General common area requirements

Additional Services: The following services will be performed by the on-site staff as time permits.

- Power Wash walk ways and alleys. (Spring/Fall)
- Power Wash garage doors.
- Power Wash trash areas.
- Replace all damaged ballasts
- Clean interior and exterior sconces
- Remove and secure or dispose of unauthorized items from common areas
- Iron Fence Repair (weld, scrape and paint)

Seasonal:
- Water: From May 1st through September 30th
  - Six (6) Entrance Beds on Halsted
  - Two (2) Entrance Beds on 14th Place
  - Forty-Eight (48) Hanging baskets on Halsted
  - Watering pots on Emerald Street
  - Large planter near 1530 Halsted
  - General areas not covered by automatic sprinkler system
- *Remove Snow & apply de-icing
- Cut grass and edging
- Weed
- Roof maintenance; remove debris, clear drains, observe/report open seams or flashing (Fall).

Tasks may be adjusted in order to respond to higher priorities on site as designated by the Board or Management. Agent will staff the property seven (7) days a week for approximately ten man-hours (10) per day (Monday through Sunday) between the hours of 7:00 am to 5:00 pm in order to maintain the property per the above specifications. Agent will provide a total of eighty man-hours per week the

Initials: _MOR_ / _h_

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639



**PHOENIX RISING** MANAGEMENT GROUP, LTD.
REBUILDING THE TRADITION OF CHICAGO'S REAL ESTATE MANAGEMENT

equivalent of two full-time personnel. During the summer months (May 1 through September 30) Agent will augment the staff with one additional full time person for forty (40) hours per week to meet the watering requirements. Agent will provide a weekly schedule for our employees, but that schedule can change without notice. The agreement provides us scheduling flexibility and enables us to offer quality services at the prices proposed. We will provide reduced coverage on Federal Holidays at time and a half.

Agents fee for the above-cited services, payable in monthly increments, will be six thousand five hundred dollars ($6,500.00), equating to seventy eight thousand dollars ($78,000.00) annually. Annual increases will be negotiated during budget development. The Board of Directors, as majority, may direct the removal and replacement of any personnel at the site without explanation.

*Agent will not charge for snow removal and de-icing during normal business hours for personnel normally assigned to the Association. Agent will charge for personnel required to augment snow removal efforts at a rate of forty-five dollars ($45.00) per hour during normal business hours. Agent will charge at a rate of sixty dollars ($ 60.00) per hour during non-business hours.

In the event that either party institutes legal action against the other under this Agreement, then in that event the prevailing party shall be entitled to recover all damages (including but not limited to, consequential damages) and to be paid its costs and professional fees (including, but not limited to, reasonable attorney's fees) from the losing party.

Failure by any party to enforce any provision of this Agreement in the event of a particular default shall not be deemed to be a waiver of any future default or of the provision so violated. If any provision of this Agreement shall be found invalid or unenforceable, the remaining provisions shall remain in full force and effect.

The Association shall indemnify, defend and hold Agent harmless from and against all claims, including, but not limited to, those alleging negligence, damages, losses and expenses, including, but not limited to, attorney's fees or consequential damages arising out of, resulting from or in connection with any snow/deicing services. Each party whose signature is affixed hereto hereby represents and warrants that he or she is authorized and empowered to execute and deliver this Agreement on behalf of the parties hereto and bind the person or entity on whose behalf his or her signature is affixed.

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures this 25th day of August 2011.

_____
Michael Kennelly, COO
Phoenix Rising Management Group, LTD.

_____
Mary Jane Reilly, President
University Village Homeowners' Association
Board of Directors

946 W. RANDOLPH, SUITE 200, CHICAGO, ILLINOIS 60607
PHONE: 312.850.3251   FAX: 312.850.3258
WWW.PHOENIXRISINGGROUP.COM

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

### VETERAN OWNED AND OPERATED

**Rider:** Residential Community Association Management Agreement

**Date:** November 30, 2015

**Association:** University Village Homeowners' Association, 1609 South Halsted Street, Chicago, Illinois 60608

**Agent:** Phoenix Rising Management LLC, 1550 West Carroll Avenue, Suite 300, Chicago, Illinois 60607

This Rider to the Management Agreement (Agreement) is entered into by and between the University Village Homeowners' Association (Association) located at 1609 South Halsted Street, Chicago, Illinois, 60608, which is established in accordance with the laws of the State of Illinois and Phoenix Rising Management LLC. (Agent) located at 1550 West Carroll Avenue, Suite 200, Chicago Illinois, 60607, is intended to supplement and amend the Management Agreement (Agreement) dated November 29, 2010 and the Custodial Addendum (Agreement) dated August 5, 2011 entered into between the Parties (Association, BoD, Homeowners and Agent).

In the event of any inconsistency between the terms of the Agreement and this Rider, the Rider shall control.

**Authority of the agreement:** The Board of Directors (BoD) of the Association, on behalf of the Association, hereby appoints Agent to provide Management Services and represent the Association as Managing Agent and Agent accepts such appointment.

**The parties further agree as follows:**

**Section 1: Term of the Agreement:** The BoD appoints Agent to exclusively provide services, as defined herein and all applicable attachments or addendums, for the Association effective January 1, 2016 (Effective Date) for a period of two (2) years (Initial Term) after Effective Date. Thereafter, the term of this Agreement shall automatically renew for successive two (2) year renewal terms unless the Agreement is terminated as provided in Sections 11 and 12.

**Section 2: Routine Management Services of Agent:**
2.11 Prepare bid packages for all unbudgeted requirements exceeding ten-thousand ($10,000.00).
2.12 Maintain Unsecure Association web-site:
2.12.1 Annual cost not to exceed $6,000.00
2.12.2 Post documents as directed by the BoD or its designated representatives.
2.12.3 Provide four (4) hours of support monthly to maintain the web-site. Non-cumulative. Not to exceed four (4) hours without BoD approval.

**Section 3: Limitations on Agent's Authority and Responsibility:**
3.1 Agent shall not make any unbudgeted expenditures or nonrecurring contractual obligation exceeding $2,500.00 with the exceptions of BoD approved contractual obligations, budgeted items or to address Emergency Conditions (Section 15).
3.2 Agent shall not make any single purchase of equipment, tools or supplies exceeding $2,000.00.

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

### VETERAN OWNED AND OPERATED

**Section 6: Attendance at BoD Meetings:**
6.1 Attend meetings, not to be held on holidays or weekends. Meetings not to exceed two (2) hours:
6.1.1    Four (4) meetings of the BoD annually.
6.1.2    Twelve (12) Requirement Review Sessions annually.

**Section 7: Disposition of Funds:**
7.1 Agent shall deposit all monies in a financial institution of Agent's choice whose deposits are insured by the federal government up to the maximum allowed by law and the FDIC. Association funds shall be maintained in accounts which are separate from the funds of Agent or any other entity.
7.2 Agent has no obligation to advance funds to the Association. Any funds advanced to the Association by Agent shall be immediately repaid to Agent, unpaid balances shall bear an interest rate as per Attachment A.

**Section 9: Agents Compensation for Routine Services:** The Association shall pay Agent a monthly fee of:
9.1 $8,062.50 ($96,750.00 annually) for its performance of Routine Management Services.
9.2 $8,481.88 ($101,752.56 annually) for its performance of Custodial and Maintenance Services.
9.3 These fees will not be adjusted during the first three (3) years. The fee shall be adjusted a minimum of 5% annually, following the first three (3) years (2018) based on a pro-rated share of the preceding years bonus allocation made by the BoD. For example if the BoD allocates 100% of the bonus pool in December of 2018, then Agent is entitled to the full 5% increase in 2019. If the BoD allocates 50% of the bonus pool then Agent is entitled to a 50% increase equating to 2.5%  (not to be construed as a 50% increase in the overall base fee).
9.4 Bonus Pool:
9.4.1    The BoD and Agent will establish an annual Bonus Pool as follows:
9.4.2    The BoD may contribute up to $15,000.00 to the Bonus Pool.
9.4.3    Agent shall match the BoD contributions up to $15,000.00 but has no obligation to contribute in excess of this amount.
9.4.4    The BoD will determine the percentage allocation of the Bonus Pool NLT December 10th of the calendar year in which the bonuses are to be awarded. Management, in collaboration with the BoD President or other single designated representative of the BoD, will determine final allocations by individual staff members. The BoD determines the total amount to be allocated, Management and a BoD representative will determine specific allocations by individual. Bonuses will be distributed by the end of each calendar year.
9.5 Agent shall be compensated for Non-Routine Services as delineated in the fee schedule (Attachment A).
9.5.1    The Fee Scheduled will be negotiated annually with the BoD. A draft of the Fee Schedule will be provided to the BoD No Later Than (NLT) July 1 of the year in which the Fee Schedule is to go into effect. The BoD and Agent must in "good faith" reasonably negotiate the final Fee Schedule prior to September 1 of the year prior to when the Fee Schedule is to go into effect. For example, Agent shall provide a copy of the draft Fee Schedule for 2017 NLT July 1, 2016 and both the BoD and Agent must arrive at a final position NLT than September 1, 2016. The current Fee Schedule (Attachment A) will serve as the base. Agent is not obligated to reduce fees from the current 2016 Fee Schedule. If Parties are unable to come to an agreement, then the previous fee schedule will remain in effect. New services added but not listed in the Base Fee Schedule will be automatically posted to the update. Changes to the Fee Schedule shall be communicated and incorporated into this Agreement with Proper Notice.

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

### VETERAN OWNED AND OPERATED

**Section 10: Obligations of the Association:**

10.6 Hold Agent harmless for all claims against agent related to the Unsecure Web-Site and pay all associated legal expenses.

10.7 Identity a Member of the BoD or Homeowner (HO) to serve as the designated Point Of Contact (POC) for the unsecure Association Web-Site. Agent shall implement directions of the POC with full confidence this POC represents the BoD.

10.8 Identify a Member of the BoD as POC to negotiate the annual Fee Schedule with Agent. Agent will negotiate with full confidence the POC represents the BoD.

10.9 Formal Resolution to adopt Rules & Regulations which must at a minimum contain:

10.9.1 Noise restrictions.

10.9.2 Pet restrictions.

10.9.3 Fine Schedule.

10.9.4 Process to appeal fines.

10.9.5 Architectural Guidelines.

10.10 Maintain a sufficient operating balance to pay the expenses set forth in the Association Budget, the AOS and this agreement.

10.11 The BoD will cooperate with Agent to the extent required to perform expeditiously, efficiently and economically the services required under this Agreement.

10.12 Familiarize new members of the BoD with this agreement, standards and customs of the Association.

10.13 Enforce basic standards of civility within the Association (BoD, HO and Renters). If a member of the Association acts in an inappropriate, hostile, aggressive or otherwise threatening or degrading manner toward the staff, vendors servicing the Association or other members of the Association, on more than one occasion (physically, orally, electronic or through social media), the BoD or an appointed representative will directly engage the offending individual in a good faith effort to correct this behavior. If the BoD is unable or unwilling to affect this behavior then the BoD, will on behalf of the Association, through Agent, engage Associations legal counsel to take the appropriate action. Socially unacceptable, aggressive, demeaning or disruptive behavior will not go unchecked or uncensored becoming an acceptable norm within the Association.

10.14 Budget:

10.14.1 The BoD will make its best efforts to approve the Sub-Association contributions to the HOA Budget no later than August 31st of each calendar year.

10.14.2 The BoD will make its best efforts to approve the HOA annual budget no later than no later than December 1st.

10.9 Authorize use of automatic electronic on-line transfers, such as Electronic Checks (eChecks), to pay recurring Association Fees, contractual, utilities, insurance or debt servicing.

10.10 Utilize a third party accounting firm to collect votes/proxies, verify eligibility, audit and certify annual election results.

10.12 Responsible for the payment of all non-routine services, which will be processed as contractual obligations.

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

## VETERAN OWNED AND OPERATED

**Section 11 & 12: Termination:** Either the Association or Agent may terminate this Agreement during any Renewal Period provided that written notice is given to the other party no earlier than the one-hundred and twentieth (120) days prior and no later than the ninetieth (90th) day prior to the expiration of said Renewal Period.

Upon termination, the Association shall assume the obligations of any contract or outstanding bill executed by Agent under this Agreement. Agent may withhold and deposit funds in its operating account, not to exceed the aggregate amount of all outstanding bills at the time of termination (as a general guideline ten percent (10%) of the annual operating budget, for ninety (90) days after the end of the month in which this Agreement is terminated, in order to pay bills previously incurred but not yet invoiced, service transition requirements and to close accounts. Notwithstanding the funds set aside to satisfy pending Association obligations and transition requirements, all remaining contractual obligations through the remaining term of the agreement shall be immediately addressed from available funds too include all previously processed credits. Agent shall deliver to the Association, within ninety (90) days after the end of the month in which this Agreement is terminated, any balance of monies due the Association which were held by Agent with respect to the Association, a third party audit/compilation of the Association's records, as well as a final accounting reflecting the balance of income and expenses with respect to the Property as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Association.

12.1 Remedy and Mediation: Termination by the association may be enacted after prior written notice is provided to Agent, identifying specific task to be remedied or Breaches of the terms of the Agreement. Agent shall have thirty (30) calendar days from receipt of notice to remedy or cure said task and breaches, with a response in writing to the BoD. At which time, both parties further agree, in good faith, to mediation between the parties facilitated by Kovitz, Shifrin, Nesbit, P.C.. If no agreement is reached during mediation or Agent fails to remedy or cure breach, within sixty (60) days, following Agents written response, the Association may terminate the Agreement.

**Section 21: Proper Notice (communications):** Any notice required of Agent under this Agreement shall consist of one of the following (separately or collectively referred to as "Proper Notice"): formal letter delivered by first class mail to the BoD President or members of the BoD or notices sent to the BoD by electronic means (email). Notice to Agent shall consist of a formal letter delivered by first class mail to the Principal or notices sent to the Principal by electronic means (email).

Agent may publish notices including but not limited to; additions or adjustments to ancillary services provided by Agent, updates to the Vendor Program, updates to the Insurance Program, introduction of new client programs or adjustments to Agents structure or business model. Such notices may be published in conjunction with the Association's Monthly Financials; adjustment to the Annual Operations Schedule (AOS); or inclusion in the draft budget.

**Section 25: Confidentiality:** Agent, Association and BoD (Parties) recognize and acknowledge that during the term of the Agreement each party will have access to confidential information. All Parties recognize that this information is strictly confidential and agree that neither will divulge, disclose or communicate to anyone, directly or indirectly, during the term of this Agreement or for two (2) years thereafter, any information of any kind, nature or description concerning any matters affecting or relating to the other Party. The Parties hereto acknowledge that any breach of the terms of this section is a material breach of this Agreement and as such the aggrieved party shall be entitled to seek, as additional damages, an amount equal to five (5) times the amount of the damages awarded.

4

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

### VETERAN OWNED AND OPERATED

**Section 26: Emergency Conditions:** Defined as a situations in which the life, health, safety, well-being of the Association residents or a significant risk of damage or the potential loss/damage to Association property exists. This may also include situations in which a system failure is or could result in a significant hazard, inconvenience, suspension of essential services or restrict access to residents. Agent has the authority to respond to these situations and obligate Association funds as necessary, notwithstanding limitations set in Section 3. Agent will use best judgment when managing these situations and will make best efforts to notify the BoD.

**Section 27: Vendor Program:** Agent will defer to vendors as directed by the BoD. Agent's affiliate will maintain a vendor program in order to control third-party service provider access and services provided to the Association. Vendors will enter and exit the program routinely. Agent will periodically provide adjustments to the program or updated lists of vendors to the BoD with Proper Notice.

**Signatures:** Each person whose signature is affixed hereto in a representative capacity hereby represents and warrants that he or she is authorized and empowered to execute this agreement.

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures as of the 30th day of November, 2015.

Agent:                                           Board of Directors:

_____        _____
Michael Kennelly, CEO                     Mary Jane Reilly, President, BoD
Phoenix Rising Management, LLC.      University Village Homeowners' Association

**Attachments:**
A: Fee Schedule.

5

FILED DATE: 7/8/2021 5:01 PM  2021CH03335
FILED DATE: 1/20/2021 3:50 PM  2021L000639

# PHOENIX RISING MANAGEMENT, LLC.

## VETERAN OWNED AND OPERATED

**FEE SCHEDULE (ATTACHMENT A):**

Periodic fee schedule updates are incorporated into the Management Agreement with Proper Notice by reference.

**Reproduction/Mailings:**

- Account Statements: At Cost
- Certified Mailings: At Cost
- Checks: $0.20/per
- Copies (Black & White): $0.20/page
- Copies (Color): $0.50/page

- Envelopes:
  - Small: $0.15.envelope
  - Large: $0.45/envelope
- FedEx/Courier: $15.00/package
- Lamination: $2.00 per sheet
- Postage: At cost

**Services applied against individual Owner Account:**

- Violation Notice : $50.00/per notice
- Evictions/Rentals: $105.00/hour
- NSF Fee: $50.00/occurrence

**Additional Services** (per hour with 1 hour minimum, unless stated otherwise):

- Accounting Services $120.00
- Clerical $50.00
- Community Manager $80.00
- Court Appearance/prep $120.00
- Credit Card Processing 10% total charge (utilities only)
- Custodial $50.00
- Doorman/Security Services $50.00
- Emergency Services $80.00
- Finance on Receivables 2% per month
- Handyman $60.00
- Insurance Processing $105.00
- IT/Web Services $ 60.00

- Lock Outs (if key on file): $20.00
- Mail Box Keys $50.00
- Surveillance Video Review $120.00
- Payroll Processing 15% (payroll)
- Power Washing $50.00
- Project Management $120.00
- Snow Removal & De-icing
  - Business Hours: $45.00
  - After Hours: $60.00
- Taxes:
  - Returns: $400/filing.
  - Appeals: $120.00
- Teleconferences 20% (of base charge)

**Emergency Services:** All services provided after normal business hours, Federal Holidays, weekends or when Agent office is closed. Normal business hours defined as 8:30 a.m. to 5:30 p.m. Monday through Friday. Services rendered between the hours of midnight to 8:30 a.m. Monday – Friday, Federal Holidays and weekends billed at 2-hour minimum.

6

JAN 2 9 2018

[illegible stamp]

**Rider:** Residential Community Association Management Agreement

**Date:** January 22, 2018

**Association:** University Village Homeowners' Association, 1609 South Halsted Street, Chicago, Illinois 60608

**Agent:** Phoenix Rising Management LLC, 1550 West Carroll Avenue, Suite 300, Chicago, Illinois 60607

This Rider to the Management Agreement (Agreement) is entered into by and between the University Village Homeowners' Association (Association) located at University Village, Chicago, Illinois, 60607 and 60608, which is established in accordance with the laws of the State of Illinois and Phoenix Rising Management LLC. (Agent) located at 1550 West Carroll Avenue, Suite 200, Chicago Illinois, 60607, is intended to supplement and amend the Management Agreement (Agreement) dated November 29, 2010, Custodial Addendum (Agreement) dated August 5, 2011 and Rider dated November 30, 205, entered into between the Parties (Association, BoD, Homeowners and Agent).

In the event of any inconsistency between the terms of the Agreement, Addendum and Rider, this Rider shall control.

**Authority of the agreement:** The Board of Directors (BoD) of the Association, on behalf of the Association, hereby appoints Agent to provide Management Services and represent the Association as Managing Agent and Agent accepts such appointment.

The parties further agree as follows:

**Section 2: Routine Management Services of Agent:** 2.12 Maintain Unsecure Association web-site: Deleted by mutual consent.

**Section 9: Agents Compensation for Routine Services:** The Association shall pay Agent a monthly fee of:
9.1 2018 (January 1 through December 31, 2018):
9.1.1 $8,062.50 ($96,750.00 annually) for its performance of Routine Management Services.
9.1.2 $8,481.88 ($101,752.56 annually) for its performance of Custodial and Maintenance Services.
9.1.3 $3,541.67 ($42,500.04 annually) for insurance as defined in section 10.2.
9.2 2019 (January 1 through December 31, 2019):
9.2.1 $8,465.63 ($101,587.56 annually) for its performance of Routine Management Services.
9.2.2 $10,570.02 ($126,840.24 annually) for its performance of Custodial and Maintenance Services.
9.2.3 $3,541.67 ($42,500.04 annually) for insurance as defined in section 10.2.
9.3 These fees will not be further adjusted in 2018 or 2019. These fees shall be adjusted a minimum of 5% annually beginning in 2020. Adjustments greater the 5% will be proposed the BoD with submission of the draft annual budget and incorporated upon adoption of the budget.

**Section 11 & 12: Termination:** 12.1 Remedy and Mediation: Deleted by mutual consent.

FILED DATE: 7/8/2021 5:01 PM 2021CH03335
FILED DATE: 1/20/2021 3:50 PM 2021L000639

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639

**Section 28: Personnel Pay Rates:**
28.1: Agent will incorporate the following minimum pay rates for personnel directly assigned to and servicing the Association:
28.1.1  Community Manager: $80,000.00 annually.
28.1.2  Assistant Community Manager: $55,000.00 annually.
28.1.3  Facility Engineer: $35,000.00 annually
28.1.4  Hourly Personnel: $13.00 per hour.  The hourly rate will increase in 2019 to $14.00 per hour.
28.2    Pay rates may not decrease without the approval of the BoD.
28.3    The BoD may at its discretion, at any time, increase pay rates for any individual or class of employee directly assigned to the Association. Any such pay increases will be absorbed by the Association through inclusion in the appropriate budget line at a rate of 1.3.  For example, if the BoD decides to increase an hourly employees pay by $1.00 per hour, the custodial budget line will be increase by $2,704.00 annually.

**Signatures:** Each person whose signature is affixed hereto in a representative capacity hereby represents and warrants that he or she is authorized and empowered to execute this agreement.

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures as of the 22nd day of January, 2018.

Agent:                                                        Board of Directors:

_____          _____
Michael Kennelly, CEO                                 Mary Jane Reilly, President, BoD
Phoenix Rising Management, LLC.                 University Village Homeowners' Association

FILED DATE: 7/8/2021 5:01 PM   2021CH03335
FILED DATE: 1/20/2021 3:50 PM   2021L000639

## ADDENDUM

This Addendum to the Management Agreement ("Agreement") is entered into by and between the University Village Homeowners' Association ("Association") and Phoenix Rising Management, Inc. ("Agent") and is intended to supplement and amend that certain Management Agreement entered into between the parties dated November 29, 2010 as well as the Custodial Addendum to the Management Agreement dated August 5, 2011 and the Rider to the Management Agreement dated November 30, 2015.

The Agreement is modified as follows:

R1.     In the event the Association incurs an overdraft charge on any account in which Agent has deposited Association funds at Pacific Premier Bank ("Bank"), Agent shall promptly, at its sole cost and expense, render payment in-full to Bank for such overdraft charge. In the event that Agent causes any Association funds to be utilized to pay said overdraft charge, Agent shall immediately inform Association that it has utilized Association funds and shall promptly reimburse Association for such costs and expenses.

R2.     In the event of any inconsistency between the terms of the Agreement and this Addendum, the Addendum shall control.


DATED: _____, 20___



UNIVERSITY VILLAGE                         PHOENIX RISING MANAGEMENT, INC.

HOMEOWNERS' ASSOCIATION


By:_____              By:_____


Its:_____             Its: _Community Manager_


iManage\CUN1015\00100\3859824.v1-3/4/19

Hearing Date: 11/8/2021 9:45 AM - 9:45 AM
Courtroom Number: 2508
Location: District 1 Court
      Cook County, IL

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

# EXHIBIT  D



# PHILADELPHIA
## INSURANCE COMPANIES

A Member of the Tokio Marine Group

**Claims Department**
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

0000136-0000271 SPRES 001   931044

Personal & Confidential: Risk Manager
Phoenix Rising Management, LLC
1550 W Carroll Ave Ste 300
Chicago IL,   60607-1035



FILED DATE: 7/8/2021 5:01 PM 2021CH03335



**PHILADELPHIA**
INSURANCE COMPANIES

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

10/14/2020

Personal & Confidential: Risk Manager
Phoenix Rising Management, LLC
1550 W Carroll Ave Ste 300
Chicago IL, 60607-1035

Re: **LOSS ACKNOWLEDGEMENT LETTER**

| | |
|---|---|
| **Claim Number:** | PHPV20101397997 |
| **Loss Date:** | 10/12/2020 |
| **Insurer:** | Philadelphia Indemnity Insurance Company |
| **Examiner:** | **Krystn Mundy** |
| **Examiner Phone:** | **610-766-3105** |
| **Examiner Email:** | Krystn.Mundy@phly.com |
| **Examiner Fax:** | |

**Accident Description:**
Demand from University Village HOA's attorney alleges breaches of duty to HOA including improperly retaining funds and charging additional fees after HOA terminated the management contract.

Dear Policyholder:

We have received notice of your loss that occurred on 10/12/2020. Claim number PHPV20101397997 has been assigned to this loss. The examiner assigned to handle this loss, their email address, and their telephone and fax numbers are noted above. In all future communication, please reference this claim number to the assigned examiner listed above.

Sincerely,
William J. Benecke
Executive Vice President Claims



FILED DATE: 7/8/2021 5:01 PM   2021CH03335

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

# EXHIBIT E

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

| | |
|---|---|
| **From:** | Mundy, Krystn |
| **To:** | Gene Wilkinson |
| **Subject:** | RE: Phoenix Rising Management re: University Village HOA. |
| **Date:** | Tuesday, November 3, 2020 2:39:21 PM |

The Cover Pro policy has expired as of May 2020 and this was not reported in time

**Sincerely,**

## Krystn Mundy

**Professional Liability Claims Specialist**
**Philadelphia Insurance Companies**
A Member of the Tokio Marine Group

Claims Department
P.O. Box 950
Bala Cynwyd, PA 19004
**Direct Dial**: 610-766-3105, Krystn.Mundy@phly.com
**PHLY.com**

---

**From:** Gene Wilkinson <gwilkinson@assuranceagency.com>
**Sent:** Monday, November 2, 2020 12:39 PM
**To:** Mundy, Krystn <Krystn.Mundy@phly.com>
**Subject:** Phoenix Rising Management re: University Village HOA.

| |
|---|
| **CAUTION:** Be mindful prior to opening non-TMNA attachments and/or links. |

Krystn,

Can you please give me a call relative to a recent complaint that was assigned to you, this was not in fact a duplicate, but a request to review that case under a different line of business and policy term.

Please give me a call for some clarity.

**GENE WILKINSON,** Sr. Claims Advocate

Assurance, a Marsh & McLennan Agency LLC company

20 N. Martingale Road, Suite 100 | Schaumburg, IL 60173

p 847.598.8750 | m 224.283.2593

gwilkinson@assuranceagency.com | www.assuranceagency.com

Follow us on: Twitter | LinkedIn | Facebook | YouTube

***PLEASE NOTE: As of April 1, 2020, Assurance Agency Ltd. (Assurance) has joined Marsh & McLennan Agency LLC.

FILED DATE: 7/8/2021 5:01 PM  2021CH03335

This e-mail transmission and any attachments that accompany it may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law and is intended solely for the use of the individual's to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, any disclosure, dissemination, distribution, copying or other use or retention of this communication or its substance is prohibited. If you have received this communication in error, please immediately reply to the author via e-mail that you received this message by mistake and also permanently delete the original and all copies of this e-mail and any attachments from your computer. Please note that coverage cannot be bound or altered by sending an email. You must speak with or receive written confirmation from a licensed representative of our firm to put coverage in force or make changes to your existing program.

Please consider the environment before printing this email. ****************** Internet Email Confidentiality ****************** The information contained in this message (including any attachments) may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that it is strictly prohibited (a) to disseminate, distribute or copy this communication or any of the information contained in it, or (b) to take any action based on the information in it. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.
*********************************************************************

Hearing Date: 11/8/2021 9:45 AM - 9:45 AM
Courtroom Number: 2508
Location: District 1 Court
          Cook County, IL

FILED
7/8/2021 5:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH03335

13970085

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

# EXHIBIT  F



FILED DATE: 7/8/2021 5:01 PM   2021CH03335

120 West Madison Street
Suite 1300
Chicago, Illinois 60602
Dirk E. Ehlers
312 549-9382 P
312 549-9389 F
DEhlers@CopeEhlers.com

July 2, 2021

**VIA U.S. MAIL AND EMAIL**

Michael Kennelly
Phoenix Rising Management, LLC
1550 W. Carrol Ave.
Suite #300
Chicago, IL 60607
Email: mk@prmchicago.com

| Re: | **Insurer:** | **Philadelphia Indemnity Insurance Company** |
|---|---|---|
| | **Insured:** | **Phoenix Rising Management, LLC** |
| | **Policy No.:** | **PHSD1441019 (Cover-Pro)** |
| | **Policy Period:** | **May 1, 2019 to May 1, 2020** |
| | **Limit of Liability:** | **$1 million Each Claim subject to $1 million Aggregate** |
| | **Deductible:** | **$5,000 per Claim** |
| | **Claimants:** | **University Village Homeowner's Association** |
| | **Company File No.:** | **1401026** |
| | **Our File No.:** | **100-779** |

Dear Mr. Kennelly:

As you will recall, our law firm represents the interests of Philadelphia Indemnity Insurance Company ("PIIC") under Cover-Pro Policy No. PHSD1441019 (the "Cover-Pro Policy") issued to Phoenix Rising Management, LLC ("Phoenix"), in connection with various matters for which Phoenix has submitted notice of Claims under the Policy to PIIC, which includes a lawsuit captioned *University Village Homeowner's Association v. Phoenix Rising Management, LLC*, Case No. 21 L 000639, filed on January 20, 2021 in the Circuit Court of Cook County, Illinois (the "Lawsuit").

PIIC has been investigating this matter under a reservation of its rights, remedies and expenses, whether at law, in equity or under the Cover-Pro Policy. We are providing this letter to you on behalf of PIIC as the contact for Phoenix in connection with insurance-related matters, with a copy to the insurance agent for Phoenix, Gene Wilkinson, at Assurance. However, if this or any additional coverage communication in regard to Phoenix should be provided to any other person, please advise.

This letter, which supplements and incorporates any prior coverage communications provided by PIIC regarding the Lawsuit, provides PIIC's coverage position based upon the allegations by the plaintiff in the Lawsuit and the terms and conditions of the Cover-Pro Policy.

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 2

Please note that our discussion of the allegations in the Lawsuit should not be construed as an indication that it is the position of PIIC that such allegations have been substantiated.

As discussed in greater detail below, PIIC is declining coverage for this matter under the Cover-Pro Policy as it is not a Claim that was timely reported under the terms of that Cover-Pro Policy. Given this declination, PIIC would ordinarily be compelled to file a declaratory judgment action against Phoenix seeking a declaration of its rights and obligations under the Cover-Pro Policy so it cannot later be claimed that PIIC has waived any of its coverage defenses under the Cover-Pro Policy. However, given the clear lack of coverage under the Cover-Pro Policy, and that PIIC has acknowledged (subject to the terms and limitations set forth in our letter of July 2, 2021) under Private Company Protection Policy No. PHSD1539541 (the "Private Company Policy") to advance a portion of the Defense Costs incurred in the Lawsuit from the date of the notice of same, it would seem to be unnecessary for PIIC and Phoenix to engage in coverage litigation. We are therefore requesting that Phoenix sign the acknowledgement set forth at the end of this correspondence which acknowledges that Phoenix is withdrawing any claim for coverage under the Cover-Pro Policy. If that acknowledgment cannot be obtained, PIIC is prepared to file a declaratory judgment action against Phoenix in a court of competent jurisdiction to obtain a ruling regarding the lack of coverage available for this matter under the Cover-Pro Policy.

## I.  Background

### A.  The February 14, 2020 Demand Letter and the April 3, 2020 Response

The University Village Homeowner's Association (the "Association"), through counsel at the Kovitz Shifrin Nesbit firm, sent a February 14, 2020 letter to Phoenix regarding the November 19, 2010 Management Agreement (the "Agreement") between the Association and Phoenix. The February 14, 2020 Letter contained numerous allegations regarding the actions of Phoenix in managing the Association and certain fees that Association alleged were improperly charged:

- The letter demanded that Phoenix identify why the Association was charged a $2,000 Registered Agent Fee and stated that "[i]f no basis exists to justify the charges, the Board demands that Phoenix reimburse the Association any amounts that were improperly charged during both 2018 and 2019."

- The letter noted that on July 18, 2018, Phoenix withdrew $2,000 from the Association's account for obtaining a "License/Permit"; that on January 19, 2019, Phoenix withdrew $1,500 for an "annual report"; and that on March 8, 2019, Phoenix withdrew $3,541.67 also for an "annual report." The February 14, 2020 letter "demands that Phoenix identify its basis for the charges discussed above. If no basis exists to justify these charges, the Board demands that Phoenix reimburse the Association any amounts improperly charged on June 18, 2018, January 29, 2019 and March 8, 2019."

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 3

- The letter requested that Phoenix confirm whether the "15th St. addresses" were due to be billed any charges for two (2) months of reserves and/or ISF charges.

- The letter notes that, per the Association's insurance policy, a credit in the amount of $3,218.21 appears to have been deposited by Phoenix into the Association's account on February 8, 2019; that Team Leader Giovanni Feliciano confirmed in e-mail correspondence dated May 28, 2019 that the credit was applied to account for certain overpayments by the Association of its 2018 insurance premium; but that the Association's October 2019 bank statement appears to indicate that on October 10, 2019, Phoenix reversed its decision to afford the Association with the credit and instead withdrew the above amount from the Association's account. The letter request that the "Board hereby requests that Phoenix honor its decision to credit these funds to the Association and return the Three Thousand Two Hundred and Eighteen Dollars and Twenty-One cents ($3,218.21) to the Association."

- The letter also alleges that Mr. Feliciano also stated in his May 28, 2019 e-mail correspondence that "[a]n additional credit of $3,509.53 (for a total balance of $6,727.74) [was] pending" but that notwithstanding Mr. Feliciano's representation that Phoenix would remit payment of the $3,509.53 to the Association, Phoenix had failed and/or refused to do so. The letter advised that "the Board hereby requests that Phoenix honor its decision to credit these funds to the Association and remit payment of the Three Thousand Five Hundred and Nine dollars and Fifty-Three cents ($3,509.53) currently due and owing to the Association."

- The letter states that, to correct certain overcharges incurred during 2017 pertaining to insurance coverage for the Association, Phoenix issued a credit to the Association in the amount of $7,738 payable through reduced management fees, and that Phoenix reversed the credit by withdrawing $7,738 from the Association's account. The letter states that the Association "hereby request[s] that Phoenix honor its decision to credit these funds to the Association and return the Seven Thousand Seven Hundred and Thirty-Eight dollars ($7,738) to the Association."

- The letter notes that, as it pertains to insurance coverage procured for the Association, it is our understanding that the Association also incurred charges in the approximate amount of $36,000 for additional insurance coverage over and above the coverages authorized by the parties' Agreement despite the fact that the Association had elected not to utilize Phoenix's Preferred Vendor Program. The letter states that "we hereby request that Phoenix credit any and all charges related to insurance coverage secured on behalf of the Association over and above the policy placed with Phoenix Rising Insurance Services, LLC."

- The letter notes that on October 3, 2019, Phoenix withdrew $150,000 from the Association's account and identified the purpose of the withdrawal as "Escrow" but that when the Association's auditor questioned the withdrawal, Phoenix simply referred the

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 4

auditor to the termination clause contained in its Agreement with the Association. The letter states that "we hereby request that Phoenix describe, in detail, the basis for its decision to withdraw One Hundred and Fifty Thousand dollars ($150,000) from the Association's account."

- The letter also advised that during a recent review of the Association's financial records, the Association discovered approximately $68,000 dollars of overage charges that were incurred by the Association in connection with landscaping services rendered by Semmer Landscape, LLC. The letter requested that Phoenix explain why the Association incurred the overage charges and provide our office with any and all documents evidencing that said charges were imposed by Semmer Landscape, LLC.

- The letter notes that the Association discovered a $750 charge that arose during November 2018 pertaining to "BOD guidance." The letter "request[s] that you identify the basis for Phoenix's decision to charge said amount to the Association."

- The letter notes that the ledger provided by Phoenix to the Association reveals several charges that arose after December 1, 2019 for services purportedly rendered on the Association's behalf, which include, but are not limited to, "Vehicle Maintenance," "Janitorial" services, and maintenance allegedly performed at the property. The letter states that "we hereby request that you advise as to why Phoenix continued to incur expenses on behalf of the Association notwithstanding the fact that the term of the Agreement had expired. In addition, we also hereby demand that Phoenix credit the Association for any and all expenses that arose subsequent to December 1, 2019."

- The letter also notes that certain "Reserve Expenses" in the amount of $99,075.42 were recently disclosed by Phoenix, consisting of the following charges: (1) Professional Services - $13,725.56, (2) Capital Repairs - $37,424.93, and (3) Exterior Painting Project - $47, 924.93. The letter further notes that the "Reserve Expenses" were not disclosed in any of the monthly financial reports that were generated by Phoenix during the term of the Agreement. The letter states that "we request that Phoenix identify why it has only just disclosed these 'Reserve Expenses' as due and payable from the Association."

- Finally, the letter notes that upon reviewing the ledger for the 940-944 W. College Parkway Condominium Association, which is a sub-association within the Association, the Association's auditor discovered a credit in the amount $4,582.14, and asked for the basis for Phoenix's decision to afford the $4,582.14 to the 940-44 W. College Parkway Condominium Association.

On April 3, 2020 Phoenix responded to each of the foregoing points that were asserted by the Association in its February 14, 2020 letter. Phoenix generally asserted that Phoenix was entitled to all of the fees it had collected; that the Association had an outstanding balance of

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 5

$740,484.86; that Phoenix had considered and agreed to grant the Association's credit requests totaling $14,465.75; and that Phoenix was willing to negotiate a reasonable settlement agreement.

## B.    The September 28, 2020 Demand Letter

On September 28, 2020, the Association, through its counsel John Grady of Grady Bell LLP, issued a letter captioned "RULE 408 SETTLEMENT COMMUNICATION" to Phoenix's counsel, Mitchell Bryan of Williams, Bax & Saltzman, P.C. The September 28, 2020 letter states declares that Grady Bell LLP was retained by the Association to prevent Phoenix "from perpetrating an egregious fraud" against the Association. It further states that:

> During July 24, 2019 discussions between Phoenix and the Master Association about renewing the term of the Agreement, Phoenix's owner, Michael Kennelly, attempted to extort the Master Association by telling three members of the Master Association's Board that if the Master Association terminated the Agreement then Phoenix would find a way to impose significant additional charges on the Master Association. As you know, the Master Association was not deterred and it terminated the Agreement effective December 1, 2019. True to their word, Phoenix and Mr. Kennelly followed through with their extortionate threat. They wrongfully retained $150,000 of the Master Association's funds, and then with an April 3, 2020 letter (the "Letter") to the Master Association attempted to claim $890,484.86 in fictitious additional fees and charges in obvious retaliation for the termination. This letter responds to all of the points Phoenix raised in the Letter, and then, in a good-faith attempt to avoid litigation in the Circuit Court of Cook County and all the publicity that would potentially involve for both sides, concludes with a settlement demand which we believe to be extremely reasonable given Phoenix's exposure to significant compensatory and punitive damages arising directly from Phoenix's shocking breaches of the fiduciary duties that it owed to the Master Association as its agent.

The September 28, 2020 letter reiterates the assertions that had been included in the February 14, 2020 letter from the Association, and specifically demands:

- A refund of the $3,000 registered agent fees;

- A refund of the additional $3,000 charged in regard to the "license / permit" and "annual report" issues;

- Payment of $12,000 regarding amounts received by Phoenix in connection with the 15th Street sub-associations;

- Reimbursement of $36,000 in alleged unauthorized insurance costs;

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 6

- Reimbursement of $150,000 alleged to be unlawfully retained by Phoenix;

- Reimbursement of $68,000 in landscape overage charges;

- Reimbursement of fees for post-termination services;

- Reimbursement of fees for "routine" services; and

- Disgorgement of all profits received by Phoenix in connection with work by any vendors hired by the Association.

The September 28, 2020 letter also alleges that Phoenix executed a scheme that diverted sub-association funds that should have been paid to the Association, and used those funds to pay both itself and its preferred vendors, depriving the Association of at least $237,000 in the process. The September 28, 2020 letter was concluded with a settlement demand for $400,000, expiring on October 9, 2020.

### C.     The Lawsuit

On January 20, 2021, the Association filed the Lawsuit against Phoenix.  The Lawsuit alleges that as a result of the Association's termination of the Agreement on December 1, 2019 and the discussions preceding same, Phoenix retaliated in various ways:

- Withdrawing $150,000 from the Association's bank account in or about October 2019;

- Imposition of excessive "registered agent fees" of $2,000 in 2018 and again in 2019;

- Imposition of excessive license/permit and annual report fees of $2,000;

- Imposing $36,000 in unauthorized insurance charges; and

- Revoking credits for prior insurance overcharges.

The Lawsuit further alleges that Phoenix:

- Improperly overcharged for landscape services in an amount of more than $47,000;

- Engaged in a scheme where Phoenix diverted funds owed to the Association by sub-associations to pay both itself and its preferred vendors, depriving the Association of at least $254,000; and

- Collected undisclosed profits from its vendor program, alleging that some or all of the vendors hired by Phoenix through its vendor program paid undisclosed fees to Phoenix or

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 7

its affiliates as a condition of participation – fees for which Phoenix and its affiliated performed not work and therefore violated 225 ILCS 427/85(a)(12).

Based upon the foregoing allegations, the Lawsuit seeks to establish the liability of Phoenix under two Counts:  Count I, for alleged breach of contract, and Count II, for alleged breach of fiduciary duty.  The Association seeks a judgment "in excess of $50,000," plus punitive damages, costs and any other relief the Court may deem appropriate.  Phoenix has retained the law firm Fullett Swanson P.C. for its defense in the Lawsuit.

## II.    The Policy

The Policy was in effect from May 1, 2019 and expired on May 1, 2020. Pursuant to the Policy's Section IV., LIMITS OF LIABILITY, as amended by the PROPERTY MANAGER PRO PAK ELITE Endorsement, PI-PLSP-124 (09/11) (the "Pro-Pak Endorsement"), PIIC's maximum aggregate liability for all damages arising out of all claims made during the Policy Period is $1 million.

As also reflected in the Cover-Pro Policy's Section IV., LIMITS OF LIABILITY, as amended by the Pro-Pak Endorsement, Section III., DEFENSE COSTS IN ADDITION TO THE LIMIT, "claim expenses," as defined by the Cover-Pro Policy, are in addition to, and not part of, the Cover-Pro Policy's Limit of Liability.  That section provides:

Regardless of the number of (a) insureds under this Policy, (b) persons or entities who allege damages or (c) claims made or suits brought, our liability is limited as follows:

A.    We shall be liable to pay that portion of any damages in excess of the applicable Deductible as stated in the Declarations for any one claim up to the Limits of Liability as stated in Item 4. of the Declarations.  A Deductible shall apply to each and every claim, including claim expenses, and such Deductible shall be borne by you.  The Deductible shall be uninsured and be at your own risk.

B.    Our maximum aggregate liability for all damages arising out of all claims made and reported during the policy period shall be the Limit of Liability stated in the Declarations as Aggregate.  The Limit of Liability during any Extended Reporting Period added to this policy shall be the remaining portion, if any, of the Aggregate Limit of Liability provided by this policy as stated in Item 4. of the Declarations.

C.    Claims based on or arising out of the same act or circumstance, or a series of similar or related acts or circumstances shall be considered a single claim and shall be considered first made during the policy period or the Extended

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 8

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Reporting Period (if applicable), of the policy in which the earliest claim arising out of such act(s) or circumstance(s) was first made and all damages shall be subject to the same Each Claim Limit of Liability.

D.   Payment by us of claims expenses incurred with any claim, shall not serve to reduce the Limit of Liability stated in Item 4. of the Declarations.

As set forth in Item 5. of the Declarations, coverage under the Cover-Pro Policy is subject to a Deductible of $5,000 per Claim.

## III.   Coverage Discussion

### A.   Insuring Agreements and Definition of "Insured"

Under Section I., INSURING AGREEMENTS, the Cover-Pro Policy provides as follows:

A.   Professional Liability Coverage

We shall pay on your behalf all sums, not exceeding the Limits of Liability and in excess of the applicable Deductible set forth in the Declarations, for which you shall become legally obligated to pay as damages resulting from any claim first made against you during the policy period or any subsequent extended reporting period arising out of a wrongful act committed after the retroactive date stated in Item 6. of the Declarations and prior to the end of the policy period.

B.   Defense and Settlement

We, in your name and on your behalf, shall have the right and duty to investigate, defend, and conduct settlement negotiations, including selection of defense counsel, in any claim or suit.

We shall not settle any claim without your consent, such consent not to be unreasonably withheld. Should you refuse to consent to any settlement recommended by us, and acceptable to the claimant, and elect to further contest the claim, our liability for such claim shall not exceed the amount for which the claim could have been settled, including claim expenses incurred, up to the date of such refusal, plus 50% of covered damages and claim expenses in excess of such settlement amount, it being a condition of this insurance that the remaining 50% of such damages and claim expenses excess of the first settlement amount shall be borne by you at your own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 9

apply until the settlement amount exceeds the Deductible amount stated in Item 5. of the Declarations.

You shall not admit liability for, or make any voluntary settlement, or incur any costs or expenses in connection with any claim except with our written consent.

We shall not be obligated to pay any claim or judgment or claim expenses or to defend any suit after the applicable Limits of Liability have been exhausted.

C.     Supplemental Payments

We will pay up to two hundred and fifty dollars ($250) per individual insured per day for each day any such individual insured is required to appear at a trial, hearing or arbitration proceeding involving a claim against such insured, subject to a five thousand dollar ($5,000) sublimit of liability ("Trial Sublimit of Liability").  The Trial Sublimit of Liability shall be in addition to the Limits of Liability as shown in Item 4. of the Declarations.

Under Section II., DEFINITIONS, Paragraph Q. the Cover-Pro Policy defines "You, your, insured" to mean:

1.     The named entity.

2.     Any subsidiary.

3.     Any independent contractor while acting on your behalf but solely as respects the provision of professional services.

4.     Any individual insured.

Under Section II., DEFINITIONS, Paragraph H. the Cover-Pro Policy defines "Named Entity" to mean "the proprietor, firm or organization specified in Item 1. of the Declarations."  As the organization specified in Item 1. of the Declarations, Phoenix Management is an "insured" under the Policy.

**B.     Definitions of "Claim," "Wrongful Act" and "Professional Services"**

Under Section II., DEFINITIONS, Paragraph B. the Cover-Pro Policy defines "claim" as follows:

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 10

B.     Claim means a demand received by you for money or services, including the service of suit or institution of arbitration proceedings involving you arising from any alleged wrongful act.  Claim shall also include any request to toll the statute of limitations relating to a potential claim involving an alleged wrongful act.

Under Section II., DEFINITIONS, Paragraph P., the Cover-Pro Policy defines "Wrongful Act" as follows:

P.     Wrongful Act means a negligent act, error, or omission committed or alleged to have been committed by you or any person for whom you are legally responsible in the rendering of professional services.  Wrongful Act shall include personal injury arising out of the rendering of professional services.

Under Section II., DEFINITIONS, Paragraph I. the Cover-Pro Policy defines "Personal Injury" to mean "wrongful entry or eviction or other invasion of private occupancy, the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy."

Under Section II., DEFINITIONS, Paragraph K. the Cover-Pro Policy defines "Professional Services" to mean "services rendered to others for a fee solely in the conduct of your profession as stated in Item 9. of the Declarations."  Item 9. of the Declarations identifies the profession of Phoenix Management as "Property Manager."  Pursuant to the Pro-Pak Endorsement, the Policy defines "Property Manager" as "a professional who performs services for others for a fee directed towards the management of residential, commercial, retail or industrial properties."

Each of the February 14, 2020 Demand Letter, the September 28, 2020 Demand Letter and the Lawsuit constitute a "Claim" under the Cover-Pro Policy, as they are each a "demand received by you for money or services . . . arising from any alleged wrongful act" and the Lawsuit further the "service of suit or institution of arbitration proceedings involving you arising from any alleged wrongful act."

In addition, under Section IV., LIMITS OF LIABILITY, Section C., as amended by the Pro-Pak Endorsement, the Cover-Pro Policy states in relevant part as follows:

C.     Claims based on or arising out of the same act or circumstances, or a series of similar or related acts or circumstances shall be considered a single claim and shall be considered first made during the policy period or the Extended Reporting Period (if applicable), of the policy in which the earliest claim arising out of such act(s) or circumstance(s) was first made and all damages and claim expenses shall be subject to the same Each Claim Limit of Liability.

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 11


As set forth above, the February 14, 2020 Demand Letter, the September 28, 2020 Demand Letter and the Lawsuit are based on or arising out of the same act or circumstances, or a series of similar or related acts or circumstances. For example, they each allege the same alleged improper acts by Phoenix, including:

- Improper withdrawals from the Association's bank account;

- Imposition of excessive "registered agent fees";

- Imposition of excessive license/permit and annual report fees; and

- Imposing unauthorized insurance charges.

In addition, the Lawsuit represents an escalation of the September 28, 2020 Demand Letter, which itself was an escalation of the February 14, 2020 Demand Letter. Accordingly, the February 14, 2020 Demand Letter, the September 28, 2020 Demand Letter and the Lawsuit are considered a single claim (hereinafter, the "University Village Claim"), considered first made during the policy period of the Cover-Pro Policy.

### C.    The University Village Claim Was Not Timely Reported to PIIC

Under Section V., GENERAL CONDITIONS, Paragraph B., Notice and Claim Reporting Provisions, Subsection 2. the Cover-Pro Policy provides:

1.    You shall, as a condition precedent to our obligations under this policy, give written notice to us as soon as practicable during the policy period, or during the Extended Reporting Period (if any) of any claim made against you.

2.    If during the policy period, or during the Extended Reporting Period (if any), but not during the Automatic Extension, you shall become aware of any circumstance which could reasonably be expected to give rise to a claim, you shall give written notice to us regarding all particulars of said incident as soon as practicable after you become aware of said circumstance. Such written notice of any circumstance must include:

    a.    the specific wrongful act; and
    b.    the damages which have or may result from such wrongful act; and
    c.    the circumstances by which you first became aware of such wrongful act.

Any claim then arising out of such wrongful act will be considered to have been first made at the time of the original notice.

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 12

In addition, under Section V. GENERAL CONDITIONS, Paragraph E., Your Duties in the Event of a Claim, Subsection 1., the Cover-Pro Policy provides:

1.      Pursuant to B. Notice and Claim Reporting Provisions, Paragraph 1. above, you shall give written notice containing particulars sufficient to identify the insured, time, place and underlying circumstances of the claim to us.

Under Section V. GENERAL CONDITIONS, Paragraph D., Extended Reporting Period, Subsections 1. and 2., the Cover-Pro Policy also provides:

1.      If we or you cancel or refuse to renew this policy for reasons other than non-payment of premium, we will provide to you a 60 day Automatic Extension of the coverage granted by this policy, at no additional charge, for any claim first made against you and reported to us during the 60 day extension period but only as respects wrongful acts committed after the Retroactive Date (if any) stated in the Declarations and prior to the date of cancellation or non-renewal. In the event you purchase replacement coverage for this policy or a Supplemental Extended Reporting Period under 2. below, said 60 day Automatic Extension period will terminate upon the effective date of said replacement coverage or Extended Reporting Period.

2.      If we or you cancel or refuse to renew this policy for reasons other than non-payment of premium, you shall have the right to purchase, for the appropriate additional payment as listed in Item 8. of the Declarations, a Supplemental Extended Reporting Period of a duration and for a premium as described on the Declarations. This extension will provide coverage granted by this policy for any claim first made against you and reported to us during the Supplemental Extended Reporting Period. This Supplemental Extended Reporting Period only applies to wrongful acts committed after the Retroactive Date (if any) stated in the Declarations and prior to the date of cancellation or non-renewal. You must apply for this extension in writing accompanied by payment of the appropriate premium prior to the expiration of the 60 day Automatic Extension period under 1. above.

As you know, the Cover-Pro Policy was nonrenewed, and no Supplemental Extended Reporting Period was purchased.  The Cover-Pro Policy was not renewed; therefore, the Automatic Extension of the coverage granted by the Cover-Pro Policy ran through June 30, 2020 (which is 60 days from May 1, 2020). However, the first notice that PIIC had of the University Village Claim was October 12, 2020, when PIIC was provided with a "GENERAL LIABILITY NOTICE OF OCCURRENCE / CLAIM" from your agent at Assurance which attached the September 28, 2020 Demand Letter.   Accordingly, notice of the University Village Claim was neither made "as soon

FILED DATE: 7/8/2021 5:01 PM 2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 13

as practicable during the policy period" nor "during the Extended Reporting Period (if any)".[1]  As a result, there is no coverage available under the Cover-Pro Policy for the University Village Claim.

### D. Additional Coverage Issues

Although PIIC's position is that there is no coverage for the University Village Claim because notice of same was not timely provided under the Cover-Pro Policy, we further note that several additional provisions in the Cover-Pro Policy would preclude or limit coverage in connection with the University Village Claim, as follows.

### 1. "Wrongful Act" and "Professional Services"

As noted above, under Section II., DEFINITIONS, Paragraph P., the Cover-Pro Policy defines "Wrongful Act" in relevant part to mean "a <u>negligent</u> act, error, or omission committed or alleged to have been committed by you . . . ."  (Emphasis added.) The University Village Claim alleges that Phoenix intentionally breached its agreement with the Association and otherwise participated in an intentional retaliatory scheme.  Illinois courts have consistently held that a lawsuit based upon an intentional "scheme" of the defendants should not be viewed as asserting negligent conduct.  *See*, *e.g.*, *Steadfast Ins. Co. v. Caremark Inc*., 359 Ill. App. 3d 749, 835 N.E.2d 890, 900-901 (1st Dist. 2005); *Rubloff, Inc. v. American Nat. Fire Ins. Co*., No. 95 C 6845, 1997 WL 264327 (N.D. Ill. May 13, 1997) (despite count for breach of contract, complaint based upon scheme to divest an employee of his stock did not allege "any negligent, act, error or omission of the insured," and was also excluded as involving a "fraudulent, criminal or malicious act").  PIIC must therefore reserve its right to deny coverage for the University Village Claim on the grounds that it does not allege a "Wrongful Act" or "Professional Services."

### 2. Exclusion III.A.

Under Section III., EXCLUSIONS, Paragraph A. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

A.    arising out of, resulting from, based upon or in consequence of, any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, or gaining of any profit or advantage to which you are not legally entitled; however, we will defend suits alleging the foregoing until there is a judgment, final adjudication,

---

[1] We note that courts construing Illinois law have explained given "the purpose and function of the reporting requirement in a claims-made policy, such reporting requirements are strictly construed."  *Exec. Risk Indem., Inc. v. Chtd. Benefit Servs.*, No. 03 C 3224, 2005 U.S. Dist. LEXIS 15411, at *19 (N.D. Ill. July 29, 2005) (internal quotations and citations omitted).

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 14

adverse admission, plea *nolo contendere* or no contest or finding of fact against you as to such conduct.

\*　　\*　　\*

No wrongful act of any individual insured nor any fact pertaining to any individual insured shall be imputed to any other partner, director, officer or employee for the purposes of determining the applicability of Exclusion A above.

The University Village Claim contain allegations that insureds improperly took funds from client accounts. Accordingly, PIIC is reserving its right to deny coverage for the University Village Claim if "a judgment, final adjudication, adverse admission, plea *nolo contendere* or no contest or finding of fact" would establish conduct within the scope of the foregoing Exclusion under Section III., Paragraph A. of the Cover-Pro Policy.

### 3.  Exclusion III.C.  and Definition of "Damages"

Under Section III., EXCLUSIONS, Paragraph C. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

\*　　\*　　\*

C.　　arising out of the costs of corrections, costs of complying with non-pecuniary relief, fines or penalties imposed by law or other matters which may be deemed uninsurable under the law pursuant to which this policy may be constructed.

In addition, under Section II., DEFINITIONS, Paragraph E. the Cover-Pro Policy defines covered "damages" to mean "a monetary judgment, award or settlement, including punitive damages or exemplary damages where insurable by law, but does not include the multiplied part of multiplied damages, fines, taxes or statutory penalties, including those based upon legal fees whether imposed by law, court or otherwise."

The University Village Claim specifically seeks disgorgement, which is not insurable. For example, the return of any amount of funds paid to an Insured to which an Insured is not entitled to retain would not constitute a "Damages." Courts applying Illinois law have held that a return of wrongfully obtained funds is generally not a covered loss to the party that must repay the funds. *See, e.g., St. Paul Fire and Marine Ins. Co. v. Village of Franklin Park*, 523 F. 3d 754 (7th Cir. 2008) (noting that whether the cause of failure to fund a pension was intentional or the result of using the wrong funding formula or failing to retain an actuary, the insured "would not suffer a 'loss' under the policy because it would still only be paying for an amount offset by a benefit it had already received."); *Ryerson Inc. v. Fed. Ins. Co.*, 676 F.3d 610 (7th Cir. 2012) (reimbursement

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 15

does not constitute an insurable "loss," whether based on fraud or upon an innocent mistake); *OneBeacon Am. Ins. Co. v. City of Granite City*, 2013 U.S. Dist. LEXIS 19474, 8-9 (S.D. Ill. Feb. 13, 2013) (granting the insurer's motion for summary judgment, because return of wrongfully charged fee would involve a return of "ill-gotten gain."); *Level 3 Communications, Inc., supra*; *Continental Casualty v. Duckson*, 826 F. Supp. 2d 1086 (N.D. Ill. 2011); and *Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 316 Ill. App.3d 391, 249 Ill. Dec. 75, 735 N.E.2d 679, 684 (Ill. App. 2000).

The Lawsuit further seeks punitive damages. Illinois courts have held that directly-assessed punitive damages are uninsurable. Punitive damages are non-insurable under Illinois law when they arise out of the insured's own misconduct. *Beaver v. Country Mut. Ins. Co.*, 95 Ill. App. 3d 1122 (5th Dist. 1981); *Crawford Laboratories v. St. Paul Ins. Co.*, 306 Ill. App. 3d 538 (1st Dist. 1999).

Please be advised that PIIC is reserving its right to deny coverage for any loss incurred by the Insured within the scope of the foregoing Exclusion under Section III., Paragraph C. of the Cover-Pro Policy, or for any loss that does not constitute "damages" as defined under Section II., Paragraph E. of the Cover-Pro Policy or is otherwise not insurable under the applicable law.

### 4.  Exclusion III.E.

Under Section III., EXCLUSIONS, Paragraph E. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

*     *     *

E.      arising out of, resulting from, based upon or in consequence of, directly or indirectly, any failure to effect or maintain any insurance or bond.

The University Village Claim alleges that Phoenix Management purchased insurance coverage over and above the coverages authorized by the parties' Agreement. Accordingly, please be advised that PIIC is reserving its right to deny coverage for the University Village Claim to the extent that it involves a claim or claim expenses "arising out of, resulting from, based upon or in consequence of, directly or indirectly, any failure to effect or maintain any insurance" pursuant to the foregoing Exclusion under Section III., Paragraph E. of the Cover-Pro Policy.

### 5.  Exclusion III.H.

Under Section III., EXCLUSIONS, Paragraph H. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 16

\*     \*     \*

H.      arising out of, resulting from, based upon or in consequence of, directly or
indirectly, any express warranties or guarantees or any liability you assume
under contract unless you would have been legally liable in the absence of
such contract.

Given that the allegations in the University Village Claim include Phoenix Management's
alleged liability for breach of contract, PIIC is reserving its right to deny coverage for the
University Village Claim pursuant to the foregoing Exclusion under Section III. Paragraph H. of
the Policy or under common law.  *See August Entertainment, Inc. v. Philadelphia Indemnity Ins.
Co.*, 146 Cal. App. 4th 565, 52 Cal. Rptr. 3d 908 (Cal. App. 2007); *Snyder American Casualty Co.
of Reading, Pa. v. Hotel and Restaurant Employees, et al.*, 113 Nev. 764, 942 P.2d 172 (1997).

### 6.   Exclusion III.M.

Under Section III., EXCLUSIONS, Paragraph M. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

\*     \*     \*

M.      arising out of, resulting from, based upon or in consequence of, directly or
indirectly, any services as an attorney, accountant, actuary, tax preparer, tax
consultant, real estate broker, securities broker, securities dealer, registered
representative of a securities broker or dealer, financial planner, nurse,
doctor of medicine, veterinary medicine or dentistry, architect or engineer.

The University Village Claim alleges that Phoenix Management failed in providing certain
financial-based services to its clients.  Accordingly, please be advised that PIIC is reserving its
right to deny coverage for the University Village Claim to the extent that any insured is subject to
a claim or claim expenses within the scope of the foregoing Exclusion under Section III., Paragraph
M. of the Cover-Pro Policy.

### 7.   Exclusion III.O.

Under Section III., EXCLUSIONS, Paragraph O. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

\*     \*     \*

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 17

    O.      arising out of, resulting from, based upon or in consequence of, directly or indirectly, any disputes involving your fees or charges.

The University Village Claim alleges that Phoenix Management improperly charged its clients.  Accordingly, please be advised that PIIC is reserving its right to deny coverage for the University Village Claim pursuant to the foregoing Exclusion under Section III., Paragraph O. of the Cover-Pro Policy.

**8.   Exclusion III.P., the Warranty Letters, and General Conditions V.B. and E.**

Under Section III., EXCLUSIONS, Paragraph P. the Cover-Pro Policy provides:

THIS POLICY DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES:

\*     \*     \*

    P.      arising out of, resulting from, based upon or in consequence of, directly or indirectly, any wrongful act committed prior to the policy period and subsequent to the retroactive date for which you gave notice under any prior insurance policy or which you had any basis to believe might reasonably be expected to give rise to a claim under this Policy.

You signed a warranty letter dated February 21, 2019 (the "D&O Warranty Letter") which asked the following:

    1.      After inquiry, has any claim been made, or is now pending, against the Applicant or any individual to whom this coverage may apply in the capacity of either Director, Trustee, Officer or Employee which has not already been disclosed to Philadelphia Insurance Companies in writing?

    2.      After inquiry, is any person proposed for this insurance cognizant of any fact, circumstance or situation which he or she may have reason to believe might give rise to a future claim against the Applicant or any individual to whom this coverage may apply?

You further signed a separate warranty letter also dated February 21, 2019 (the "Professional Liability Warranty Letter") which asked:

    1.      After inquiry, have any claims, suits or demands for arbitration been made against any person or entity proposed for this insurance which have not already been disclosed to Philadelphia Insurance Companies in writing?

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 18

2. After inquiry, is any person or entity proposed for this insurance aware of any act, error, omission, unresolved client/ job dispute or any other circumstance which would cause a reasonable person to believe it is or could be a basis for a claim?

You answered "no" to each of these questions in the D&O Warranty Letter and the Professional Liability Warranty Letter (collectively, the "Warranty Letters"). Both of the Warranty Letters state:

Without prejudice to any other rights and remedies of the Underwriter, any claim arising from any claims, facts, circumstances or situations whether or not disclosed above is excluded from the proposed insurance.

The Undersigned states that he / she is an authorized representative of the Applicant and declares to the best of his/ her knowledge and belief and after reasonable inquiry, that the statements set forth in this Application (and any attachments submitted with this Application) are true and complete and may be relied upon by Company* in quoting and issuing the policy. If any of the information in this Application changes prior to the effective date of the policy, the Applicant will notify the Company of such changes and the Company may modify or withdraw the quote or binder.

Moreover, under Section V., GENERAL CONDITIONS, Paragraph B., Notice and Claim Reporting Provisions, Subsection 2. the Cover-Pro Policy provides:

2. If during the policy period, or during the Extended Reporting Period (if any), but not during the Automatic Extension, you shall become aware of any circumstance which could reasonably be expected to give rise to a claim, you shall give written notice to us regarding all particulars of said incident as soon as practicable after you become aware of said circumstance. Such written notice of any circumstance must include:

d. the specific wrongful act; and
e. the damages which have or may result from such wrongful act; and
f. the circumstances by which you first became aware of such wrongful act.

Any claim then arising out of such wrongful act will be considered to have been first made at the time of the original notice.

In addition, under Section V. GENERAL CONDITIONS, Paragraph E., Your Duties in the Event of a Claim, Subsection 1., the Cover-Pro Policy provides:

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 19

1.      Pursuant to B. Notice and Claim Reporting Provisions, Paragraph 1. above, you shall give written notice containing particulars sufficient to identify the insured, time, place and underlying circumstances of the claim to us.

The University Village Claim contains allegations that Phoenix Management made various overcharges upon the Association in 2017 and 2019. Please be advised that PIIC is reserving its right to deny coverage for the University Village Claim based on the Exclusion under Section III. Paragraph P. of the Cover-Pro Policy, and PIIC is further reserving its right to deny coverage or, if warranted, rescind the Policy, based on any misrepresentations made by any Insured in the Warranty Letters executed on February 21, 2019.  Moreover, PIIC is reserving its right to deny coverage on the ground that Phoenix Management did not provide notice of a circumstance which reasonably could have been expected to give rise to a claim against Phoenix Management as required by the foregoing General Conditions under Section V., Paragraph B., Subsection 2. and Paragraph E., Subsection 1. of the Cover-Pro Policy.

## 9.   Exclusion III.CC.

Under the Pro-Pak Endorsement, Section III., EXCLUSIONS, is amended to include Exclusion III.CC., which provides:

THIS POLICY ALSO DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES ARISING OUT OF:

*      *      *

CC.     Any claim arising out of any actual or alleged commingling of or inability or failure to pay, collect or safeguard funds[.]

The University Village Claim alleges that the Insured improperly paid funds from client accounts and improperly collected monies from clients.  Accordingly, please be advised that PIIC is reserving its right to assert the applicability of the foregoing Exclusion under Section III., Paragraph CC. of the Cover-Pro Policy.

## 10. Exclusion III.FF.

Under the Pro-Pak Endorsement, Section III., EXCLUSIONS, is amended to include Exclusion III.FF., which provides:

THIS POLICY ALSO DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES ARISING OUT OF:

*      *      *

FILED DATE: 7/8/2021 5:01 PM    2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 20

FF.      Any claim arising out of the guaranteeing of the availability of funds[.]

Given that many of the allegations in the University Village Claim involve access to and availability of funds, please be advised that PIIC is reserving its right to assert the applicability of the foregoing Exclusion under Section III., Paragraph FF. of the Cover-Pro Policy.

### 11. Exclusion III. LL. / Knowledge of Wrongful Act Endorsement

Under the Pro-Pak Endorsement, Section III., EXCLUSIONS, is amended to include Exclusion III.LL., which provides:

THIS POLICY ALSO DOES NOT APPLY TO ANY CLAIM OR CLAIM EXPENSES ARISING OUT OF:

*       *       *

LL.      Any wrongful act committed with the knowledge that it was a wrongful act[.]

In addition, the Cover-Pro Policy contains a Knowledge of Wrongful Act Exclusion endorsement, PI-PLSP-056 (08/07) which states in relevant part that "this policy does not apply to any wrongful act committed with the knowledge that it was a wrongful act."

Given the allegations in the University Village Claim regarding the actions of Phoenix, please be advised that PIIC is reserving its right to assert the applicability of the foregoing Exclusion under Section III., Paragraph LL. of the Cover-Pro Policy and the foregoing Knowledge of Wrongful Act Exclusion.

## IV.    Conclusion / Avoidance of Coverage Litigation

As you may know, under Illinois common law, PIIC would have a right to file a declaratory judgment action in order to seek a declaration that there is no coverage available under the Cover-Pro Policy, in order to avoid any issue of waiver or estoppel as to its coverage defenses in light of its denial of a duty to defend Phoenix in the University Village Claim.  Given the clear lack of coverage for the University Village Claim under the Cover-Pro Policy, as well as PIIC's agreement (as set forth in its letter of July 2, 2021) under the Private Company Policy to advance a portion of the Defense Costs incurred in the Lawsuit from the date of the notice of same, PIIC proposes that PIIC and Phoenix agree that it would currently not be necessary for PIIC to file a declaratory judgment action to avoid waiver or estoppel of its coverage defenses under the Cover-Pro Policy. Such an agreement would eliminate the need for Phoenix or PIIC to expend unnecessary resources for coverage litigation at this time.

If you agree that this would be a prudent and mutually beneficial course of action for Phoenix and PIIC, please provide your countersignature below. If this cannot be agreed by July

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 21

31, 2021, despite that it would appear to be in the mutual best interest of Phoenix and PIIC to avoid the cost of coverage litigation, please be advised that PIIC would then be prepared to protect its interests by filing a declaratory judgment action as permitted under Illinois common law, in order to seek a declaration that the Cover-Pro Policy does not provide coverage for the University Village Claim.

Please note that Part 919 of the Rules of the Illinois Department of Insurance requires that PIIC advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 W. Washington St., Springfield, Illinois 62767.

Sincerely yours,

Dirk E. Ehlers

cc:    Gene Wilkinson, Assurance Agency, Ltd.
       (via email, to: gwilkinson@assuranceagency.com)

FILED DATE: 7/8/2021 5:01 PM   2021CH03335

Michael Kennelly
Phoenix Rising Management, LLC
July 2, 2021
Page 22

This will acknowledge that Phoenix Rising Management, LLC withdraws any request for coverage under Cover-Pro Insurance Policy No. PHSD1441019 issued to Phoenix Rising Management, LLC with respect to:

(1) the February 14, 2020 letter sent to Phoenix Rising Management, LLC by the University Village Homeowner's Association through counsel at the Kovitz Shifrin Nesbit firm;

(2) the September 28, 2020 sent to Phoenix Rising Management, LLC by the University Homeowner's Association through counsel at Grady Bell LLP; and

(3) the lawsuit captioned *University Village Homeowner's Association v. Phoenix Rising Management, LLC*, Case No. 21 L 000639, filed on January 20, 2021 in the Circuit Court of Cook County, Illinois.

The undersigned further represents and warrants that the execution of this agreement has been properly authorized and that the individual who executes and attests this agreement on behalf of Phoenix Rising Management, LLC has the authority to bind Phoenix Rising Management, LLC and has been authorized by it to perform such act.

Phoenix Rising Management, LLC


By: _____

Its: _____


Dated: July ___, 2021